UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

HELBACHS CAFE LLC
DBA: HELBACHS CAFE ROASTERS &
KITCHEN,

                    Plaintiff,                    CASE NO. 20-CV-758

v.

CITY OF MADISON,
COUNTY OF DANE,
JANEL HEINRICH,
MARCI PAULSEN, and
BONNIE KOENIG,
All individuals in their official capacity,

                    Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

City of Madison, County of Dane, Janel Heinrich, Marci Paulsen, and Bonnie Koenig, by

their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., file this Brief in support of

their Motion for Summary Judgment.

## <u>INTRODUCTION</u>

"There are manifold restraints to which every person is necessarily subject for the common

good. On any other basis organized society could not exist with safety to its members. Society

based on the rule that each one is a law unto himself would soon be confronted with disorder and

anarchy." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26 (1905). The Framers of

our Constitution – influenced by teachings about structuring government for the good of society –

laid the first building block as follows: "We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

In July 2020, PHMDC issued Emergency Order # 8, which required individuals to wear face coverings and among other things required businesses to post signage related to this requirement. Shortly after the order was issued, PHMDC received hundreds of complaints from concerned citizens that the Plaintiff, Helbachs Cafe, was not in compliance with the order. In accord with its policy, PHMDC investigated and found that Helbachs Cafe, was in fact, in violation of the order. PHMDC reached out to Helbachs on several occasions and attempted to receive voluntary compliance with the order. However, Helbachs blatantly refused to comply, and after continued violations, PHMDC, issued three citations to Helbachs Cafe and a Notice of Intent to Revoke License.

The lawsuit should be dismissed. Wisconsin's Legislature has delegated to local health officers the power to "promptly take all measures necessary to prevent, suppress and control communicable diseases," among other powers and duties.  And, their claims are raised without consideration of *Jacobson v. Massachusetts,* a century old United States Supreme Court decision that has never been overruled and has been reviewed by many federal courts to conclude health orders and actions such as those here do not create a "plain, palpable invasion of rights" secured by the federal law. Even under traditional analysis, Plaintiff's claims cannot be sustained on this summary judgment record.

## FACTS

### I.   Parties

Helbachs Cafe, LLC is a family-owned Wisconsin Limited Liability Company operating as a small-batch coffee roaster and bakery. (DFOF ¶ 1.) The Helbachs family includes Melissa, Casey, Nathan, Joshua, Noah, and Esther. (DFOF ¶ 2.)  Casey Helbach was the chief financial officer for the company and Nathan Helbach was the chief executive officer. (DFOF ¶ 3.) Joshua was the manager for Helbachs Cafe. (DFOF ¶ 4.)

The Company was founded in 2016 with a location in West Madison. (DFOF ¶ 5.) In March 2019, Helbachs opened a second location in Middleton, Wisconsin. (DFOF ¶ 6.) In June 2020, during the pandemic, Helbachs closed their Madison location because their revenue continued to be down. (DFOF ¶ 7.) This lawsuit was filed surrounding the events and circumstances that occurred at the Middleton location in July 2020. (DFOF ¶ 8.)

At the Middleton location, Joshua Helbach, Melissa Helbach, and Casey Helbach shared the responsibilities of managing the cafe, and had weekly meetings for communication regarding the management and operation of the business. (DFOF ¶ 9.) Helbachs also had weekly board meetings to discuss matters related to the business operations, which would have included the PHMDC health orders. (DFOF ¶ 10.) Joshua Helbach was responsible for reviewing PHMDC's health orders and making a determination as to whether anything had to be done at the business. (DFOF ¶ 11.)

Public Health of Madison and Dane County ("PHMDC") is the statutorily mandated local health department for Dane County and the City of Madison. PHMDC and its Board of Health for Madison and Dane County ("BOHMDC") were created in 2007 pursuant to the authority provided

by Wis. Stat. § 251.02(1m) and under the terms of an Intergovernmental Agreement ("IGA") entered into between the governing bodies of the City of Madison and Dane County pursuant to Wis. Stat. § 66.0301. (DFOF ¶ 12.)

## II.   Coronavirus & Emergency Order # 8

A novel strain of coronavirus, SARS-CoV-2 (commonly COVID-19), spread throughout the world in 2020, creating the most widespread global pandemic since the 1918 Spanish Flu. (DFOF ¶ 13.) As a result, international, national, state, and local emergency health orders have been issued with a variety of restrictions on human behavior and daily life in order to control and suppress the virus. (DFOF ¶ 14.)

The Center for Disease Control ("CDC") determined COVID-19 is a severe acute respiratory illness. (DFOF ¶ 15.) COVID-19 can spread through exposure to respiratory droplets carrying infectious virus. (DFOF ¶ 16.) Respiratory droplets are produced during exhalation, e.g., breathing, speaking, singing, coughing, sneezing, and span a wide spectrum of sizes. (DFOF ¶ 17.) Larger droplets, some of which are visible, fall out of the air rapidly within seconds to minutes while close to the source. (DFOF ¶ 18.) Smaller droplets can remain suspended for many minutes to hours and travel far from the source on air currents. (DFOF ¶ 19.) The epidemiology of COVID-19 indicates that most infections are spread through close contact, not airborne transmission. (DFOF ¶ 20.) Airborne transmission can occur under special circumstances, including enclosed spaces, prolonged exposure to respiratory particles, and inadequate ventilation or air handling. (DFOF ¶ 21.)

Those at greatest risk of infection are persons who have had prolonged, unprotected close contact (i.e., within 6 feet for 15 minutes or longer) with an individual with infection, regardless of whether the individual has symptoms. (DFOF ¶ 22.) Pre-symptomatic and asymptomatic

individuals may carry and spread the virus, and the onset and duration of viral shedding and the period of infectiousness for COVID-19 are not yet known with certainty.  (DFOF ¶ 23.) The incubation period (the time from exposure to symptom onset) ranges from 2-14 days and persons with mild to moderate COVID-19 may shed replication-competent SARS-CoV-2 for up to 10 days following symptom onset. (DFOF ¶ 24.)

Social distancing, good hygiene and avoiding gatherings indoors are all recommended ways to reduce the risk according to the CDC.  (DFOF ¶ 25.) "In general, the more closely you interact with others and the longer that interaction, the higher the risk of COVID-19 spread," based on the number of individuals, being inside, and engaging over a period with people who are not social distancing or wearing masks and may be pre-symptomatic and asymptomatic. (DFOF ¶ 26.)

In response to the COVID-19 pandemic and due to the lack of guidance from the state level,[1] PHMDC, through its Director, issued a number of emergency health orders, pursuant to the statutory mandate in Wis. Stat. § 252.03(1) that a local health officer "shall promptly take all measures necessary to prevent, suppress and control communicable diseases…." (DFOF ¶ 31.) PHMDC is the statutorily mandated local health department for Dane County and the City of Madison. (DFOF ¶ 32.)   PHMDC and its Board of Health for Madison and Dane County ("BOHMDC") – were created in 2007 pursuant to the authority provided by Wis. Stat. § 251.02(1m) and under the terms of an Intergovernmental Agreement ("IGA") entered into between the governing bodies of the City of Madison and Dane County pursuant to Wis. Stat. § 66.0301. (DFOF ¶ 33.)

---

[1] On March 12, 2020, Wisconsin Governor Tony Evers, declared a public health emergency in the State of Wisconsin. (DFOF ¶ 27.)  On March 24, 2020, to mitigate the spread of COVID-19, Andrea Palm, the Secretary of the Wisconsin Department of Health Services, issued Emergency Order 12, which ordered all individuals to stay at home or at their place of residence. (DFOF ¶ 28.) On April 16, 2020, Palm, issued Emergency Order #28, which again commanded all individuals in Wisconsin "to stay at home or at their place of residence." (DFOF ¶ 29.) On May 13, 2020, the Wisconsin Supreme Court invalidated Secretary Palm's Emergency Order #28.  (DFOF ¶ 30.)

In other words, those governing bodies, after careful study, consideration, and deliberation, made a legislatively allowed policy decision to pool resources and utilize statutory mechanisms to create the joint health department. (DFOF ¶ 32.)[2]

Wis. Stat. § 251.06(4)(b) & (c) explain who the legislature wants to appoint and supervise the local health officer. (DFOF ¶ 33.)[3]

Ms. Heinrich, as the Director of PHMDC, is the statutorily mandated local health officer defined by Wis. Stat. § 251.01(5) and credentialed by Wis. Stat. § 251.06.  She is directly accountable to the County Executive and, in turn, the County Board as set forth in Wis. Stat. § 251.06(4)(b). (DFOF ¶ 34.)  The IGA further sets forth who supervises the local health officer. (DFOF ¶ 35.) In this case, the local health officer is appointed by both the County Executive and the Mayor and confirmed by both the City Council and the County Board. Ms. Heinrich was re-confirmed by the both the City Council and the County Board on May 19, 2020. (DFOF ¶ 35.) Additionally, the local health officer for PHMDC is supervised by the BOHMDC.  (DFOF ¶ 36.)

---

[2] Wis. Stat. § 251.02(1m) states: [I]n counties with a population of less than 750,000, the county board and the governing body of a city that has a city health department *may jointly establish a city-county health department.* A city-county health department established under this subsection after September 1, 2001, *is subject to the control of the city and county acting jointly under an agreement* entered into under s. 66.0301 that specifies, in conformity with this chapter, all of the following: (a) The powers and duties of the city-county health department. (b) the powers and duties of the city-county board of health for the city-county health department. (c) The relative powers and duties of the city and county with respect to governance of the city-county health department and the city-county board of health. (emphasis added).

[3] (b) In any county with a county executive that has a single county health department, the county executive shall appoint and supervise the county health officer. The appointment is subject to confirmation by the county board unless the county board, by ordinance, elects to waive confirmation or unless the appointment is made under a civil service system competitive examination procedure established under s. 59.52 (8) or ch. 63. The county health officer appointed under this paragraph is subject only to the supervision of the county executive. In a county with such a county health officer, the local board of health shall be only a policy-making body determining the broad outlines and principles governing the administration of the county health department.

The BOHMDC is the policy-making body pursuant to Wis. Stat. § 250.01(3), which is expressly declared in the IGA. (DFOF ¶ 36.)  The BOHMDC oversees the Director.[4] (DFOF ¶ 36.) PHMDC is thus subject to the control of the City and County by the operation of the IGA and aforementioned statutes. (DFOF ¶ 36.) PHMDC implements and manages the policies set by those governing bodies (whose policy control exists through ordinances, budgets and the IGA), as well as the policies of BOHMDC. (DFOF ¶ 37.)  The BOHMDC assures enforcement of state and local health statutes and rules, adoption of City/County policies, determines program services priorities and measures are taken to provide an environment where individuals can be healthy and otherwise carries out its statutory obligations as a board of public health. (DFOF ¶ 37.) The eight-member BOHMDC is made up of one County Board Supervisor, one Common Council member, three Dane County Residents and three City of Madison residents. (DFOF ¶ 37.)  The BOHMDC has all the powers as set forth in Chapter 251.  (DFOF ¶ 37.) The BOHMDC may delegate authority to the Director, including implementation of Program Services. (DFOF ¶ 37.)  The BOHMDC also oversees finance and budgets of the PHMDC.  (DFOF ¶ 37.) The City and County created PHMDC to offer the services of a Level III local health department as specified in Wis. Stat. § 251.05 (see also Wis. Admin. DHS §§ 140.06, 140.08). (DFOF ¶ 38.)   PHMDC's program services "shall address the varying needs of diverse populations within Dane County." (DFOF ¶ 38.)

Through Ms. Heinrich, PHMDC has issued sixteen health orders after the invalidation of Order # 28.  (DFOF ¶ 21.) All of the orders have been directed at keeping individuals in Dane County safe while balancing the need to continue daily life as much as feasible. (DFOF ¶ 40.) Each carried over the similar essential terms, but added additional information calibrated to meet the

---

[4] "Director. The Mayor and the County Executive jointly shall appoint the Local Health Officer whose title shall be Director of the PHMDC, subject to confirmation of the Common Council and the County Board. The BOHMDC *shall provide supervision of the Director* and shall be responsible for any personnel decisions, other than the appointment and dismissal, regarding the Director."

evolving nature of the viral spread in the community and the emerging science surrounding COVID-19. (DFOF ¶ 41.) Generally speaking, the issuance of several of these health orders has led to a flattening or downward trajectory in in COVID-19 viral spread in the community. (DFOF ¶ 42.) These health orders are based on local epidemiology data and other aspects of community disease containment. (DFOF ¶ 43.) Controlling or containing a viral disease like COVID-19 requires more than epidemiology but also assessing two other aspects of disease containment: (1) assessing whether the health care system is being overwhelmed and the public health ability to identify and (2) from a public health standpoint, isolating positively diagnosed persons to prevent further spread. (DFOF ¶ 44.)

The plaintiff's lawsuit centers around Emergency Order # 8, the first local order to require face coverings, was issued on July 7, 2020 and went into effect on July 13, 2020. (DFOF ¶ 45.)  In Emergency Order # 8, PHMDC explained that "[t]his is a critical time for Dane County to minimize the spread of COVID-19, keep people healthy, and maintain a level of transmission that is manageable by healthcare and public health systems." (DFOF ¶ 46.) It stated that "[e]vidence suggests that wearing a cloth face covering reduces the risk of a person with a COVID-19 infection spreading the infection to others" and that "[c]loth face coverings can also protect people without a COVID-19 infection from exposure to droplets that may contain the virus." (DFOF ¶ 47.)

Emergency Order # 8 required that every individual, age five and older, wear a face covering, covering their nose and mouth when (1) in any enclosed building where other people could be present; (2) in line to enter any indoor space; and (3) when driving or riding on public transportation or private ride-sharing vehicles.[5] (DFOF ¶ 48.) And further stated that the order "should not be used as a justification to harass or harm another person who is either wearing or

---

[5] The Order recognized several exemptions to the face covering requirement stating that some people may not be able to wear a face covering due to a "medical condition, mental condition, or disability." (DFOF ¶ 49.)

not wearing a face covering." (DFOF ¶ 50.) Following these explanations about the exemptions, the Order concluded: "People should assume others have valid reasons for wearing or not wearing a face covering." (DFOF ¶ 51.)

The Order further specifically required businesses to post two signs indicating the requirements for face coverings. (DFOF ¶ 52.) First, provision 8.4(i) stated "[a]dhere to PHMDC requirements and strongly consider implementing the PHMDC recommendations and guidelines." (DFOF ¶ 53.) Second, 8.4(k) required businesses to "[p]ost PHMDC's 'Workplace Requirements for Employers and Workers' guidance document in a prominent location where all employees may access and view (Available at https://publichealthmdc.com/coronavirus/forward-dane/requirements)." (DFOF ¶ 54.)

As a result, Order # 8 required the posting of two signs: (1) the "Workplace Requirements for Employees and Workers," required under section 8.4(k) and (2) the "Mask Required" signage, required under section 8.4(i). (DFOF ¶ 55.)

Although there is a disagreement whether the "Mask Required" sign was posted on PHMDC's website at the time of the issuance of Helbach's first citation, both the "Workplace Requirements for Employees and Workers" sign and the "Mask Required" sign were posted on the website at the time of issuance of the second and third citations at issue in this case. (DFOF ¶ 58.)

When PHMDC receives a complaint regarding noncompliance of a health order, it is always their goal to receive voluntary compliance. (DFOF ¶ 3.) In the summer of 2020, if PHMDC received a complaint regarding noncompliance, it was their policy to first reach out to the business to provide education on the requirements of the health order and answer any questions the business might have. (DFOF ¶ 60.) If PHMDC received a second complaint, it was their policy that someone

from the City Attorney's Office would follow up and discuss the need and importance of complying with the health order. (DFOF ¶ 61.) If PHMDC received a third complaint, it would result in a citation to the business. (DFOF ¶ 62.) If PHMDC received subsequent complaints, PHMDC would conduct an onsite visit and if violations were observed another citation would be issued to the business or the matter would be referred to the City Attorney's office for the commencement of a prosecution action. (DFOF ¶ 63.) If PHMDC received multiple complaints and was unable to gain compliance from education and the commencement of prosecution actions, it would result in PHMDC filing a request to revoke the business' food and drink license and a BOHMDC hearing. (DFOF ¶ 64.)

### III.     Helbachs Cafes' Non-Compliance with Emergency Order # 8

In March of 2020, Nathan Helbach appeared on a talk-show, hosted by a well-known radio personality, Vicki McKenna. (DFOF ¶ 122.) On the show Nathan expressed his views about the emergency orders. (DFOF ¶ 123.) Specifically, he stated that his concerns were that if the orders stayed "in effect and businesses that were nonessential . . . were not allowed to reopen, then there could have been an instance where" Helbachs would have to discontinue operations." (DFOF ¶ 124.) Further, Casey Helbach knew Vicki McKenna through Republican events. (DFOF ¶ 125.

Helbachs Cafe also admitted that it did "nothing" in response to Governor Evers' mask-mandate order and stated that it did not implement the facial coverings requirement in their business because it believed that it was "not a business's responsibility . . . to enforce." (DFOF ¶ 65.) Further, Helbachs Cafe stated that it "had no face covering policy." (DFOF ¶ 66.)

On July 13, 2020, Casey Helbach admitted that he posted a sign at Helbach Cafe that stated, "mask free zone." (DFOF ¶ 67.) Casey explained he posted the sign because "I was exercising my freedom of speech" in response to Emergency Order # 8.  (DFOF ¶ 68.) He did not have the sign

reviewed by the company before he posted it, nor did he inform anyone at the company that he was posting it. (DFOF ¶ 69.) He wrote the sign to express his personal frustrations with PHMDC. (DFOF ¶ 70.) He posted the sign for only thirty minutes approximately. (DFOF ¶ 71.) After about a half hour, Casey Helbach took the sign down on his own, again without any direction or consultation with the business, simply because he through by taking it down he was once again exercising his freedom of speech. (DFOF ¶ 72.) Nathan Helbach reiterated that Casey Helbach did not have this "mask free zone" sign reviewed by him or any of the other family members. (DFOF ¶ 73.) He was not even aware that his father had posted the sign until he saw it on social media. (DFOF ¶ 74.) Indeed, the Plaintiff, in its complaint, stated that the "sign was a misrepresentation of our policy because we have no facial covering (mask) policy." (DFOF ¶ 75.)

On July 13, 2020, shortly before noon on the first effective date of the Emergency Order # 8 (at 11:59 a.m.), PHMDC received the first of hundreds of complaints that were sent that day regarding Helbachs Cafe's noncompliance with Emergency Order # 8. (DFOF ¶ 76.) No other business had as many complaints lodged against them regarding Emergency Order #8 as Helbachs Cafe. (DFOF ¶ 77.) The complaints were varied about the Café's compliance with the health orders: some of the complaints were related to the "mask free zone" sign, while many other complaints were nonrelated and merely reported that Helbachs were not in compliance with Emergency Order # 8 for other reasons (such as employees not wearing masks indoors, employees making and serving food with no masks, no social distancing, capacity exceeding the limitations, employees treating people who wear masks poorly, employees actively telling people not to wear masks,  lack of signage regarding masks and social distancing, etc.). (DFOF ¶ 78.)

On July 14, 2020, PHMDC continued to receive complaints regarding Helbachs Cafe. (DFOF ¶ 79.) Due to the volume of the complaints received, PHMDC sent two employees, Bonnie

Koenig, a Public Health Services Supervisor for PHMDC, and Molly Budlong, the Sanitarian for PHMDC, out on a compliance check to Helbachs Cafe. (DFOF ¶ 80.) Koenig and Budlong visited the Cafe and observed several violations of Emergency Order #8, specifically they observed that employees who were working at the Cafe were not masked and that there was no signage on the front door stating, "Mask Required." (DFOF ¶ 81.) Koenig and Budlong did not make contact with the store owners, rather they merely observed the violations and left the Cafe. (DFOF ¶ 82.)

Later that day, Koenig attempted to make phone contact with the establishment to provide education on the requirements of Emergency Order # 8 and discuss Helbach Café's noncompliance with the order but did not receive an answer and left a message. (DFOF ¶ 83.) Koenig then called the business owner, Casey Helbach, but also did not receive an answer and she left a voicemail. (DFOF ¶ 84.) Koenig also sent an educational letter to Helbachs via email and hard copy regarding the requirements of Order # 8. (DFOF ¶ 85.)

On July 15, 2020, after not hearing back from the Cafe or its owner and after receiving additional complaints of noncompliance, Marci Paulsen, a City of Madison Assistant City Attorney, and Bonnie Koenig visited Helbachs Cafe to educate the owners, provide them with the appropriate signage, and discuss the need and importance of complying with the health order. (DFOF ¶ 86.) Casey Helbach stated that when PHMDC visited on July 15, 2020, they stated that they wanted to educate him. (DFOF ¶ 87.)

At the time she went to the Cafe, Paulsen believed that the signage requirements were posted on PHMDC's website. (DFOF ¶ 88.) Even if the Plaintiff is correct that the first citation was issued prior to the "Mask Required" signage being posted on the website, the Plaintiff's avenue to contest the issuance and validity of the citation would have been in circuit court. (DFOF ¶ 89.) Regardless,

Casey Helbach admitted that the "Mask Required" sign was never posted at Helbachs Middleton location. (DFOF ¶ 90.)

Paulsen and Koenig spoke with the onsite manger/owner of Helbachs who stated that he had no intention of complying with Emergency Order # 8 regarding face coverings and refused to post the signs that were required by the order. (DFOF ¶ 91.) Casey Helbach stated that after the visit from PHMDC, Helbachs Cafe did "nothing" in response to their request that Helbachs Cafe, put up signage. (DFOF ¶ 92.)  (As noted earlier, Order # 8 required the posting of two signs: (1) the Workplace Requirements for Employees and Workers, required under section 8.4(k) and (2) the Mask Required signage, required under section 8.4(i). (DFOF ¶ 93.)

At 3:10pm on July 16, 2020, PHMDC sent out an email to all businesses, including Helbachs Cafe regarding the "Mask Required" sign that was required to be posted. (DFOF ¶ 94.) The email was received and opened by josh@helbachscoffee.com at 4:30pm. (DFOF ¶ 95.) Casey Helbach stated that Joshua Helbach would have received all of the emails regarding the food and drink license, and further stated that it would have been Josh's responsibility to determine whether any required signs should be posted at Helbachs Cafe. (DFOF ¶ 96.) Nathan stated that it was typical for Joshua to show the board copies of the health orders, and the board would discuss the provisions applicable to the business. (DFOF ¶ 97.) Casey acknowledged that there was a board meeting, where there was a discussion regarding whether or not to post the Mask Required sign. (DFOF ¶ 98.) As noted above, Helbachs Cafe did "nothing" in response. (DFOF ¶ 99.)

On July 20, 2020, Kathryn Vellon entered Helbachs Cafe, LLC and was asked to remove her face covering by an employee. (DFOF ¶ 100.) Assistant City Attorney Paulsen spoke with Ms. Vellon and verified her complaint.  (DFOF ¶ 101.) As a result, Assistance City Attorney Paulsen authorized a citation for violating Section 1(e)(i)(1) of Emergency Order # 8. (DFOF ¶ 102.)

On July 21, 2020, Molly Budlong and Marci Paulsen visited the Helbachs Cafe, and spoke with Joshua Helbach. (DFOF ¶ 103.) Upon entering they observed that there was no "Mask Required" sign posted, as required under Emergency Order # 8. (DFOF ¶ 104.) They asked if Josh was going to post the signs, including the "Workplace Requirements for Employers and Workers" and the Mask Required sign, and he indicated that he would have to speak to the board. (DFOF ¶ 105.) Paulsen and Budlong also served Helbachs with a citation for the violation of not posting the required signage on July 15, 2020. (DFOF ¶ 106.) This citation was issued in accord with PHMDC's policy that after a third complaint was received, a citation would be issued. (DFOF ¶ 107.)

On July 23, 2020, Doug Voegeli, the Environmental Health Division Director for PHMDC, visited Helbachs Café. (DFOF ¶ 108.) Upon entering Helbachs Cafe, he observed that there was no "Mask Required" sign posted, as required under Emergency Order # 8. (DFOF ¶ 109.)  He also observed employees and customers without face coverings in the business and attempted to educate the onsite manager/owner present regarding the face covering requirement. (DFOF ¶ 110.) The individual refused to post the signage provided by PHMDC regarding "Workplace Requirements for Employers and Workers" and "Mask Required." (DFOF ¶ 111.)   Voegeli provided a copy of Emergency Order # 8 so the business knew why there were being cited and what they needed to do to comply. (DFOF ¶ 112.) Voegeli also served two citations. (DFOF ¶ 113.) One was served for asking a customer to remove their face covering, which occurred on July 20, 2020 and one was issued and served for the failure to post the signage required in Emergency Order # 8. (DFOF ¶ 114.)

On July 24, 2020, Marci Paulsen visited Helbachs Cafe to deliver a letter from PHMDC requesting a meeting with Helbachs. (DFOF ¶ 115.)

On July 28, 2020, PHMDC and Helbachs Cafe had a skype call to discuss compliance with Emergency Order # 8. (DFOF ¶ 116.)

On August 3, 2020, after repeated violations of Emergency Order # 8 and failure to comply with the same, and after consultation among the staff and legal counsel, PHMDC decided to issue a Notice of Intent to Revoke License to Helbachs, jointly written by staff and legal counsel, and signed by Janel Henirch. (DFOF ¶ 117.) In the Notice of Intent to Revoke License, we required Helbachs Cafe to stop posting false and misleading information about our newly implemented facial covering requirement because we believed that it would be confusing for individuals to receive mixed messages, especially false and misleading information, regarding their facial covering policy. (DFOF ¶ 118.)

The Plaintiff had a scheduled hearing on the Notice of Intent to Revoke License scheduled for August 25, 2020. (DFOF ¶ 119.)

Shortly after receiving the Notice of Intent to Revoke, Helbachs Cafe created a "Go Fund Me" page to help fund their lawsuit against PHMDC. (DFOF ¶ 120.) Currently, on their "Go Fund Me" page, the Plaintiff continues to exercise its freedom of speech rights, in speaking out against PHMDC and its emergency health orders. (DFOF ¶ 121.)

On August 10, 2020, the Plaintiff filed this lawsuit along with a Motion for Temporary Injunctive Relief pursuant to Wis. Stat. § 813.02. (DFOF ¶ 126.) The Motion for TRO sought to enjoin PHMDC from enforcing its Health Orders against its business. (DFOF ¶ 127.) The Plaintiff requested the following relief in its Complaint: "A declaration that Helbachs has not violated any lawful provision of Emergency Order 8" and "A declaration that any citations issued were done do invalidly." (DFOF ¶ 128.)

On August 19, 2020, the Plaintiff withdrew its motion for a temporary injunction. (DFOF ¶ 129.) Because the Plaintiff withdrew the Motion for a Temporary Injunction and hearing related thereto, and given the pendency of this lawsuit, PHMDC cancelled the August 25th revocation hearing and later dismissed the Notice of Revocation entirely. (DFOF ¶ 130.)

Casey Helbach stated that he understood that as a license holder that if his business did not comply with the terms of the license, that the government could seek to suspend or revoke that license. (DFOF ¶ 131.) Casey also stated that he had never appeared before the board that governs PHMDC or the city or county board for matters related to the health orders. (DFOF ¶ 132.)  Nor has Nathan Helbach ever appeared in front of PHMDC's board of at any of the city/county board meetings. (DFOF ¶ 133.)

Nathan Helbach admitted that Helbachs Cafe had received the "Mask Required" email and it was his understanding that businesses were to post the sign on their front door. (DFOF ¶ 134.) Although he surveyed businesses within a two-block radius of Helbachs Cafe as to whether they received citations, he does not know if they put the required signs up or if any of the businesses had had complaints filed with PHMDC against them. (DFOF ¶ 135.)

Since the filing of this lawsuit, Helbachs Cafe reopened in its previously closed Madison Location on April 1, 2021. (DFOF ¶ 136.)

**IV.**   **Allegations Against PHMDC**

On August 10, 2020, the Plaintiff, Helbachs Cafe, LLC, filed this lawsuit alleging First, Fifth, and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983, as well as a claim that the defendants do not have statutory authority to enforce the signage requirement under Emergency Order # 8. (DFOF ¶ 126.) The claims will be discussed further below.

## LEGAL STANDARD

Summary judgment is proper if the record shows there are no genuine issues of material fact and establishes the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is outcome determinative of an issue. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). The movant must show there are no disputes of material fact and that judgment should be granted as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The respondent must then "produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Ulichny v. Marton*, 249 F.3d 686 (7th Cir. 2001). The mere existence of some immaterial factual disputes will not defeat a properly supported motion for summary judgment—nor will speculation, hearsay or conclusory allegations suffice. *Gorbitz v. Corvilla*, 196 F.3d 879 (7th Cir. 1999).

## ARGUMENT

I.  **DEFENDANTS HAVE AUTHORITY TO ENFORCE PUBLIC HEALTH EMERGENCY ORDER # 8 DUE TO THE WISCONSIN LEGISLATURE'S DIRECT GRANT OF POWER TO THE LOCAL HEALTH OFFICER UNDER WIS. STAT. § 252.03.**

The Plaintiff's Complaint at "Claim 1" contends the Defendants do not have the authority to enforce signage requirements under Emergency Health Order # 8. It is doubtful this court should exercise jurisdiction over this state claim under its supplemental jurisdiction[6] or, alternatively, because the claim should be stayed because related claims about Wisconsin statutory authority are currently pending in courts in the State of Wisconsin including the Wisconsin Supreme Court.[7]

---

[6] Plaintiffs do not justify the basis for supplemental jurisdiction in their Complaint for this Claim. Nor do they explain that they have other state law remedies if they believe any health order citations, or the Notice of Revocation was issued in error. Chapter 68 of the Wisconsin Statutes includes express provisions for the review of a decision by a municipal officer, municipal employee, or agent acting on behalf of a municipality. See Wis. Stat. § 68.01.

[7] This court should also consider staying any ruling on this claim. The Supreme Court in *Colorado River Water Conservation District v. United States,* 424 U.S. 800 (1976), acknowledged that federal courts have power to stay proceedings in deference to a parallel state suit in order to promote "wise judicial administration." The Seventh

For completeness, the Wisconsin Legislature granted authority to the local health officer in a way that belies the Plaintiff's contentions to the contrary.

Wis. Stat. § 252.03(1) **<u>mandates</u>** that the "local health officer shall promptly take all measures necessary to prevent, suppress and control communicable diseases." Additionally, § 252.03(2) states the "[l]ocal health officers may do what is reasonable and necessary for the prevention and suppression of disease; forbid public gatherings when deemed necessary to control outbreaks or epidemics…." The Legislature has plainly created and delegated power to the local health officer, making Plaintiff's contentions in the Complaint about DHS's statutory authority and about the Supreme Court's decision in *Palm* (about DHS' authority) entirely beside the point. (See Dkt. 1, Exhibit A, ¶ 59.)

Statutory interpretation begins with the plain language of the statute. We "assume that the legislative purpose [of the statute] is expressed by the ordinary meaning of the words used." *United States v. Lock*, 466 F.3d 594, 698 (7th Cir. 2006). Absent clearly expressed Congressional intent to the contrary, the plain language should be conclusive. *Id.* The language and design of the statute as a whole may also provide guidance in determining the plain meaning of its provisions. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988). We avoid interpreting a statute in a way that renders a word or phrase redundant or meaningless. *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 574–75 (1995).

---

Circuit has also acknowledged in *Cleary v. Philip Morris In*c. that certification of a question of state law is appropriate if the court is "genuinely uncertain about a question of state law that is vital to a correct disposition of the case." 656 F.3d 511, 520 (7th Cir. 2011). Here, the enforceability of the emergency orders of PHMDC is currently being challenged in state court in two different lawsuits: (1) *Jeffrey Becker et al vs. Dane County et al* pending in Dane County Circuit Court, Case No. 2021CV000143; and (2) the consolidated cases of *Sara Lindsey James v. Janel Heinrich*, 2020AP001419, *WCRIS v. Janel Heinrich*, Case No. 2020AP001420, and *St. Ambrose Academy, Inc. v. Joseph T. Parisi*, Case No. 2020AP001446 pending in the Wisconsin Supreme Court. Thus, this court should stay a decision on this Claim until the Wisconsin Courts have ruled on the issue.

The language of Wis. Stat. § 252.03 is plain.  It contains common and ordinary terms like "shall", "take all measures," "reasonable," "necessary," "prevent," "suppress," and "control." None are technical nor terms of art.  The language is also broad – "shall promptly take all measures necessary to prevent, suppress and control communicable diseases" and "do what is reasonable and necessary."  The broad language is not contingent upon or limited by the language "forbid public gatherings," as Plaintiff alleges. (Dkt. 1, Exh. A, ¶ 66.) Rather, the textual placement of "forbid public gatherings" is illustrative and, regardless, the textual placement of "forbid public gatherings" does not appear in reference to the preceding section's "shall promptly take all measures necessary to prevent, suppress and control communicable diseases."  This interpretation makes sense – forbidding a public gathering is just one method or tool a public health officer could deploy to "do what is reasonable and necessary for the prevention and suppression of disease" or to "promptly take all measures necessary to prevent, suppress and control communicable diseases."

Moreover, this plain language – "shall promptly take all measures necessary to prevent, suppress and control communicable diseases" and "do what is reasonable and necessary" – does not appear in the powers afforded State DHS under Wis. Stat. § 252.02.  That statute does not govern the authority of local health officers, which is separately set out in Wis. Stat. § 252.03. The separate grant of local authority under § 252.03 provides, among other things, powers to "prevent, suppress and control communicable diseases," Wis. Stat. § 252.03(1), as well as to "do what is reasonable and necessary for the prevention and suppression of disease." Wis. Stat. § 252.03(2). Such statutory commands are not present with such force in the Legislature's grant of authority to DHS under § 252.02.

Additionally, the "reasonable and necessary" and "all measures necessary" mandates cannot be treated as meaningless surplusage, whether by ignoring the same or by arguing it is limited to the solitary power to forbid public gatherings. The Wisconsin Supreme Court previously rejected statutory interpretation arguments attacking such important statutory commands of Ch. 252. *See City of Milwaukee v. Washington*, 2007 WI 104, ¶¶ 33-34, 304 Wis. 2d 98, 735 N.W.2d 111 (the absence of a specific word or phrase was not dispositive when interpreting Wis. Stat. § 252.07(9)(a)) and the Court embraced the statute's various parts, applied commonly accepted meanings, and allowed the statutory language to be interpreted "broad enough" to serve its purpose).

The Legislature bestowed on local health officers through § 252.03 the explicit authority to issue orders such as Emergency Order # 8. Wis. Stat. § 252.03(2) plainly grants local health officers the power to address COVID-19 doing what is "reasonable and necessary for the prevention and suppression of disease." The Defendants here are well within their authority to do what is reasonable and necessary to slow the spread of the virus by requiring facial coverings and seeking compliance therewith through informal efforts of education or reminders and then proceeding to progressive enforcement through citations and the Notice of Intent to Revoke.[8]

---

[8] Claim 1's allegations about the Defendants authority under County Ordinances likewise fails to state a claim. In addition to Wis. Stat. § 252.03, the Defendants are acting in accordance with Dane County Code Section §46.33 and §46.40. Dane County Code Section §46.33(5) states "[w]henever any regulated facility or regulated activity fails to meet the standards established by . . . any provision of the Dane County Ordinances, the health officer is authorized to seek revocation of the operator's permit." As a result, the health officer is authorized – properly so here – to initiate legal action against the operator, in conjunction with the corporation counsel's offices. Dane County Ordinance §46.40(2) states "[i]t shall be a violation of this chapter to refuse to obey an Order of the Director of the Public Health Madison and Dane County entered to prevent, suppress or control communicable disease pursuant to Wis. Stat. 252.03." This provision simply echoes the authority of the state statute, nothing more.

Here, not only are the Defendants authorized to act under Wisconsin Statute § 252.03, but they are also authorized to act under Dane County Code Section §46.33(5). Both statutes work together to allow for the Health Director to take all measures necessary to prevent, suppress and control communicable diseases.

## II.   PLAINTIFFS' CLAIMS OF CONSTITUTIONAL VIOLATIONS SHOULD BE DISMISSED UNDER THE CONSTITUTIONAL STANDARD SET FORTH IN *JACOBSON V. MASSACHUSETTS*

In the Complaint at "Claims" 2 through 4, the Plaintiff alleges a variety of constitutional violations involving equal protection (under Fourteenth Amendment and Wisconsin's corollary provision), free speech under the First Amendment and a takings clause claim under the Fifth Amendment. While Plaintiff has pled these claims under traditional constitutional principles, the claims fail as pled and under the summary judgment record when viewed through the constitutional analysis required by *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905).

In *Jacobson*, the Supreme Court created a framework by which to evaluate a State's exercise of its emergency authority during a public health crisis and instead provides for minimal judicial interference with state officials' reasonable determinations.  The Court rejected a claim that the state's compulsory vaccination law—enacted amidst a smallpox epidemic in Massachusetts—violated the defendant's Fourteenth Amendment right "to care for his own body and health in such way as to him seems best." *Id*. at 26.  The Supreme Court explained:

> There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that "persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned."  …The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is, then, liberty regulated by law."

*Id*. (quoted sources omitted).  Thus, the "liberty secured by the Constitution ... does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id*. Rather, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id*. at 27. In describing a state's police power to combat an epidemic, the Court explained, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."  *Id*. at 29.  "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27.

Importantly, the Court narrowly described the scope of judicial authority to review rights-claims under these circumstances:

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, *has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law*, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31 (emphasis added). The Court described this review as asking whether power had been exercised in an "arbitrary, unreasonable manner," *Id*. at 28, or through "arbitrary and oppressive" regulations, *Id*. at 38.  Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive. *Id*. at 38. At the same time, however, courts may not second-guess the wisdom or efficacy of the measures. *Id*. at 28, 30.  Under these standards, *Jacobson* approved the measures before it, as follows:

> Whatever may be thought of the expediency of this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution. Nor, in view of the methods employed to stamp out the disease of smallpox, can anyone confidently assert that the means prescribed by the state to that end has no real or substantial relation to the protection of the public health and the public safety. Such an assertion would not be consistent with the experience of this and other countries whose authorities have dealt with the disease of smallpox. And the principle of vaccination as a means to prevent the spread of smallpox has been enforced in many states by statutes making the vaccination of children a condition of their right to enter or remain in public schools.

*Id*. at 31-32.

Thus, while "individual rights secured by the Constitution do not disappear during a public health crisis," the government may "reasonably restrict[]" rights during such times. *Id*. at 29; *see also United States v. Salerno*, 481 U.S. 739, 748 (1987) (government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest under Due Process Clause); *Compagnie Francaise de Navigation a Vapeur v. La. State Bd. of Health*, 186 U.S. 380, 393 (1902) (upholding Louisiana's right to quarantine passengers aboard vessel—even where all were healthy—against a Fourteenth Amendment challenge); *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) (noting that "[t]he right to practice religion freely does not include liberty to expose the community ... to communicable disease"); *United States v. Caltex*, 344 U.S. 149, 154 (1952) (acknowledging that "in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved").

During this pandemic, most federal courts have considered *Jacobson*'s framework in order to evaluate constitutional challenges to public health orders, including Chief Justice Roberts who observed in a non-precedential denial of a stay: "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay United Pentecostal Church v. Newsom* (*S. Bay II*), 140 S. Ct. 1613, 1613

(2020) (Roberts, C.J., concurring) (quoting *Jacobson*). When state officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Id.* (alteration in original). State officials "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  *Id*. at 1613-1614. If a State implements emergency measures during an epidemic that curtail individual rights, courts uphold such measures unless they have "no real or substantial relation" to public health or are, "beyond all question, a plain, palpable invasion of rights secured by the federal law." *Id.*

Based on *Jacobson*, federal courts have upheld public health orders meant to curb the spread of COVID-19. For instance, in *Tigges v. Northam,* 2020 WL 4197610 (E.D. Virginia, July 21, 2020), the Plaintiff owns Zion Springs, a licensed farm winery. *Id*. at 4. He filed his case against the Governor asserting that the executive orders killed his business; part of the Governor's order required that employees must wear a face covering and that patrons spending time indoors at Zion Springs must wear a face covering. *Id*. The court stated that "[a]ny constitutional challenge to state action taken in response to a public health crisis begins with the Supreme Court's decision in Jacobson …". *Id*. The Court further concluded that the Orders at issue have a "real or substantial relation" to the COVID-19 pandemic. *Id.* Restrictions on non-essential businesses, limitations on public and private gatherings, and requirements to wear face coverings all relate directly to the Commonwealth's efforts to slow the rate of infection of COVID-19. The Court further concluded that the Orders are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id*.

Also, in *Hayes v. State of Oregon,* 2020 WL 4673461, *1 (D. Oregon, August 12, 2020)*, Hayes alleged that he was denied entry into a store because he refused to wear a face covering.

The court held that the plaintiff failed to demonstrate any likelihood of success on the merits. The Supreme Court "has distinctly recognized the authority of a state to enact quarantine law and health law of every description." *Id*. (quoting *Jacobson*) (quotations omitted). "According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and public safety." *Id*.

Additionally, the Seventh Circuit has followed *Jacobson*. In *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020), the Seventh Circuit, upheld a public health order meant to curb the spread of COVID-19. In *Elim*, churches challenged the Illinois Governor's public health order. *Id.* at 342. The Seventh Circuit denied the churches' motion for an injunction pending appeal and holding that the claims fail under *Jacobson*. *Id.* at 343. In *Illinois Republican Party v. Pritzker*, 470 F. Supp. 3d 813, 817 (N.D.Ill., July 2, 2020), political organizations argued the Illinois Governor's COVID-19 order abridged their First Amendment rights. The court denied the motion, finding it failed under *Jacobson*. *Id*. at 821-22. See also *Cassell v. Snyders*, 2020 WL 2112374, *7 (N.D. Ill. May 3, 2020) (COVID-19 qualifies as a public health crisis under *Jacobson*).

As applied here against Claims 2 through 4, the Defendant's motion for summary judgment should be granted for two reasons.  <u>First</u>, the health orders issued by PHMDC, and particularly the facial covering and related signage requirements of Emergency Order #8 challenged in this lawsuit, have a "real or substantial relation" to the current COVID-19 public health crisis, and the Plaintiff does not assert otherwise.  Indeed, the Plaintiff do not attack the legitimacy and seriousness of the COVID-19 pandemic, the underlying data and facts, and the rational for the various health orders. The requirements of the public health orders at issue in this lawsuit

undoubtedly relate to public health because they seek to reduce virus transmissions by requiring individuals to wear face coverings and requiring businesses to post signage regarding those requirements.  At the time of these events, Dane County was in the midst of a serious public health crisis, as contemplated in *Jacobson* and as acknowledged by the Plaintiffs.  The Defendants had a compelling government interest in fighting the pandemic. The orders passed by PHMDC were designed to slow the spread of COVID-19.  Plaintiffs here have neither alleged nor can they show the orders lack a "real or substantial relation" to the current COVID-19 public health crisis.

Second, Plaintiffs cannot show how Emergency Order # 8's limitations are "beyond all question, a plain, palpable invasion" of their constitutional rights.  PHMDC's challenged health order requires all individuals to wear face coverings when in public, and it requires all businesses to post signage relating to those face coverings. The health order's requirements at issue here do not ban or single out any individual's or business' constitutional rights of free speech, create differential treatment of similar groups nor physically appropriate or otherwise take all value from property. Nor do the requirements at issue in this lawsuit favor any particular expression or viewpoints over another, or favor one similarly situated group over another. Rather, Plaintiff challenges facial covering and related signage requirements that impose neutral and generally applicable rules to guide the community through a pandemic. Plaintiff's challenges are no different than those of Jacobson and its constitutional claims can fair no better.

## III.   THE PLAINTIFF IS UNLIKELY TO SUCCEED ON ITS CLAIMS UNDER TRADITIONAL ANALYSIS

Because *Jacobson* controls the disposition of the claims in this lawsuit, the court need go no further. Even if the court were to review the claims under the traditional constitutional

analysis, Helbachs Cafe cannot show genuine issues of material fact to support any of the claims.

### 1. The Plaintiff's Equal Protection Selective Enforcement Claim Fails.

The Plaintiff has alleged in Claim 2 of their Complaint that the Defendants "created a "class of one" by treating it differently than all other similarly situated businesses by only enforcing a signage requirement against the Plaintiff, despite a number of other businesses within a 1 to 2 block radius of Plaintiff having failed to comply. Helbachs Cafe has failed to allege that such "selective treatment" was motivated by an intent to discriminate, punish, and inhibit the exercise of the First Amendment. Thus, its class of one claim fails for the reasons set forth below.

The Equal Protection Clause of the Fourteenth Amendment[9] prohibits state action that discriminates on the basis of membership in a protected class or irrationally targets an individual for discriminatory treatment as a so-called "class of one." *See Enquist v. Oregon Dep't of Agric.* 553 U.S. 591 (2008). Plaintiffs do not identify themselves as members of a protected class for purposes of their Equal Protection claim. Thus, Plaintiffs appear to be proceeding under a class-of-one claim premised upon selective enforcement.

Selective enforcement, by itself, does not violate the Equal Protection Clause. *Van Dyke v. Village of Alsip*, 819 Fed. Appx. 431, 432 (7th Cir. 2020). Indeed, selective enforcement that does not offend the constitution occurs when, for example, government has limited resources which is certainly the case when its public health authorities are trying to mitigate a pandemic and triage their services ranging from education, contact tracing, issuing health orders and the myriad things

---

[9] The Wisconsin Supreme Court has tied its interpretation of the equal protection clause of the Wisconsin Constitution to the federal interpretation of the equal protection clause in the Fourteenth Amendment, labeling the Wisconsin equal protection clause the functional equivalent of the equal protection clause of the Fourteenth Amendment. *See Reginald D. v. State,* 193 Wis. 2d 299, 306 (1995); *County of Kenosha v. C. & S. Management, Inc.* 223 Wis. 2d 3737 (1999).

they do to stop the spread. *See Sutton v. City of Milwaukee*, 672 F.2d 644, 648 (7th Cir. 1982) (holding that towing illegally parked cars of people with more than one unpaid ticket while not towing cars without such unpaid tickets did not offend the constitution due to limited resources.).

To establish a class of one equal protection claim for selective enforcement, a plaintiff must allege (1) he has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment or that the cause of the differential treatment is a "totally illegitimate animus" toward the plaintiff by the defendant. *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). "It is considerably harder" to prove a selective enforcement claim, *United States v. Har*e, 820 F.3d 93, 100 (4th Cir. 2016), because it requires identification of others who were not prosecuted. *Chavez v. Illinois State Police*, 251 F.3d 612, 640 (7th Cir. 2001).

"To be considered 'similarly situated,' a plaintiff and his comparators (those alleged to have been treated more favorably) must be identical or directly comparable in all material respects," *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010), which is to say, "similarly situated individuals must be very similar indeed." *McDonald v. Village of Winnetka,* 371 F.3d 992, 1002 (7th Cir. 2004). Generic allegations that Plaintiffs are treated different from others similarly situated do not suffice as a matter of law.

In *Hilton v. City of Wheeling*, 209 F.3d 1005 (7th Cir. 2000), the Seventh Circuit dismissed a plaintiff's claim that the city police were unfair in responding to multiple complaints among neighbors. *Id*. at 1007. The plaintiff alleged that the police arrested him several times in response to complaints from his neighbors, but they did not respond similarly to his complaints about his neighbors. *Id*. However, the Seventh Circuit held that plaintiff had merely alleged uneven enforcement of local laws and, thus, his claim was dismissed. *Id*. at 1007-08. The court held that,

"to make out a prima facie case [for a class of one equal protection violation] the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Id.*

Also, in *Oakes v. Collier County,* 2021 WL 268387, *1 (M.D. Florida Fort Meyers Division, Jan. 27, 2021), Collier County issued an emergency COVID-19 health order, which required everyone in certain businesses to wear face coverings. *Id.* The Plaintiffs included various local business subject to the health order. *Id.* Shortly after the order was passed, the County cited several of the businesses for mask violations. *Id.* They collectively filed a lawsuit, asserting equal protection and First Amendment claims. *Id.* One of the businesses, "Stores" brought a class-of-one claim alleging that the County selectively enforced the Order against them and that their treatment differed from businesses in other parts of the County. *Id.* at 6. The court noted that Stores claims failed because they did not point to any similarly situated individual who was treated differently and noted that Stores did not identify a single comparator who was subject to disparate treatment. *Id.* at 7. The court stated that Store mentions businesses but does not bother to explain further, which falls woefully short of the requisite showing on the similarly situated question. *Id.*

Here, the Plaintiff has neither alleged, nor can it show that similarly situated businesses were treated better. Helbachs Cafe can only conclusory allege that PHMDC treated it differently than other businesses within a 1 to 2 block radius, but Helbachs Cafe ignores the fact that PHMDC received hundreds of complaints about its non-compliance; a fact which is not true of the other businesses.  Plaintiff's own purported search ring, only two blocks relative to a health order applying county-wide, is a far cry from the showing necessary to mount a class of one claim because it is nothing more than speculative and perfunctory as to how other businesses were treated.

PHMDC does not conduct random compliance checks regarding the health orders. Rather, it is their policy to reach out to businesses *only after* a complaint had been filed. After one complaint is filed, PHMDC attempts to provide education on the requirements of the health order and answer any questions a business might have, with the goal being voluntary compliance. PHMDC attempted to do this on July 14, 2020 and again on July 15, 2020 and only issued a citation after it became apparent that the owners were not going to comply with the health order.  PHMDC was not targeting the Plaintiff's business or treating it differently from any other business. After receiving hundreds of complaints against the Cafe, it was merely attempting to obtain voluntary compliance with Emergency Order # 8.  The Plaintiff has pled no meaningful information to support comparisons between it and other businesses, and accordingly, its equal protection claim fails.

The Plaintiff asserts no factual averments that any decision to enforce Emergency Order # 8 was made pursuant to an improper motive, as required for an equal protection selective enforcement claim, as opposed to public health officers merely fulfilling their duty of enforcement under Wis. Stat. § 252.03 and Dane County Ordinance Sec. 46.40(2). The Complaint is bare of any facts or inferences alleging that the citations issued to the Plaintiff were grounded in personal animosity as opposed to a public health officer simply fulfilling their duties to enforce the Emergency Order.

Further, even if the Plaintiff correctly pled information to support "similarly situated" establishments and information to prove that there was an improper motive, the Plaintiff's claim would still fail because it cannot "overcome the presumption of rationality attached to government action" by "negat[ing] any rational basis" for the challenged action, including any "hypothesized

30

justifications" a court may envision. *See Flying J, Inc. v. City of New Haven,* 549 F.3d 538, 545 (2008) (emphasis added).

Here, Defendants' issuance of citations and the Notice of Revocation were rationally related to procuring compliance with health orders designed to combat a pandemic. The Defendants' actions were expressly designed to reduce the spread of COVID-19. Controlling the pandemic through a variety of health orders and actions is rational, as recognized by countless federal courts around the country. *See On Fire Christian Ctr., Inc., Fischer*, 2020 WL 1820249 (W.D. Ky. 2020) (holding stopping the ongoing COVID-19 pandemic is a compelling interest "of the highest order"); *Cassell v. Snyders*, 2020 WL 212374 (N.D. Ill. May 3, 2020) (holding that curbing the spread of COVID-19 was a compelling government interest). Judge Ross in *McCarthy v. Cuomo,* 2020 WL 3286530, 4 (E.D. New York), stated "I can think of few governmental interests more pressing than protecting the public from transmission of highly-contagious and often deadly disease. The available scientific medical evidence strongly supports requiring individuals wearing to wear face coverings as it reduces the risk of a person with a COVID-19 infection from exposure to droplet."

Even if Plaintiff had evidence of irrationality, which they do not, a "given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity." *Fares Paw, LLC v. Ind. Dep't of Fin. Insts*., 755 F.3d 839, 845 (quoting *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008)). If courts can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no. *Id*. (*citing D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) ("[T]he test for rationality does not ask whether the benign justification was the actual justification. All it takes to defeat the plaintiffs' claim is a conceivable rational basis for the difference in

treatment."). Under this standard, "a class-of-one plaintiff must, to prevail, negate any reasonably conceivable state of facts that could provide a rational basis for the classification." *Del Marcelle v. Brown Cnty. Corp.,* 680 F. 3d 538, 547 (7th Cir. 2008) (quoting *Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014)). Here, the plaintiff cannot do so and accordingly its claim fails.

In sum, because Defendants acted with a rational basis in protecting the public, health, welfare, and safety of its citizens through the health order at issue and efforts to enforce the same, the Plaintiff's equal protection claim fails.

### 2. Plaintiffs' First Amendment Retaliation Claim Fails

Plaintiff alleges a claim for First Amendment retaliation in the Complaint at Claim 3. To prevail on a First Amendment retaliation, a plaintiff must prove: (1) that he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). A plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (quoting *Hartman v. Moore*, 547 U.S. 250, 259, 126 S.Ct. 1695). It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured, the motive must *cause* the injury. *Id.* Specifically, it must be a "but-for" cause, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 260, 126 S.Ct. 1695 (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway").

If those elements are established, the burden shifts to the defendant to rebut the claim by showing that the activity would have occurred regardless of the protected activity *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). If the defendant meets his/her burden, then the burden shifts back to the plaintiff, who must demonstrate that the proffered reason is pretextual or dishonest and that the real reason was retaliatory animus.

In *Amato v. Mayor Elicker,* 2021 WL 1428192, *1 (D. Connecticut, April 15, 2021), the Plaintiffs operated a restaurant called the 50's Lounge, which hosted events for political opponents of the Mayor. On March 16, 2020, the Governor issued an executive order that prohibited gatherings of 50 or more people and placed limitations on restaurants. *Id.* at * 2. On March 16, 2020, the owners began receiving calls asking why the 50's Lounge remained open and hosting large gatherings. *Id.* The 50's Lounge stated that it had been voluntarily closed since March 15. *Id.* On March 19, 2020, the Mayor issued an emergency order that limited public gatherings to less than 10 people. *Id.* On March 20, 2020, the Mayor, on a local TV station claimed that the 50's Lounge was violating the Mayor's orders and endangering the health and welfare of the community. *Id.* The photo that the Mayor showed on the news had the date blurred out, but the plaintiff recognized the photo as having been from an event that took place several weeks prior. *Id.* On the broadcast, the Mayor declared that he had complaints about the business and that he had just sent a police officer to check it out the business. *Id.* The plaintiffs alleged that the Mayor made false allegations and that she has suffered loss of business and reputation as a result. *Id.* at *3. The court held that the Plaintiff failed to allege a causal connection between the Plaintiffs' allegedly protected conduct and the defendants' alleged retaliatory acts of defamation. *Id.* at *6. The court stated that the complaint did not set forth the facts that made it plausible that the plaintiffs' hosting

of events for the mayor's political opponents caused any of the defendants' alleged retaliatory acts. *Id.*

Here, too, Helbach's Cafe's First Amendment retaliation claim fails for the following three reasons. First, the Plaintiff, Helbachs Cafe, has not engage in any speech whatsoever, much less protected speech.  That is, the Cafe's speech is not at issue, commercial or otherwise. Rather, the company is suing over another persons' speech, that of Casey Helbach, who admitted that he wrote the "mask free zone" sign for personal reasons.   "I was exercising my freedom of speech" in response to Emergency Order # 8.  (DFOF ¶ 68.) Casey Helbach did not have the sign reviewed by the company board before he posted it nor did inform anyone at the company that he was posting it. (DFOF ¶ 69.) He wrote the sign to express his personal frustrations with PHMDC. (DFOF ¶ 70.) The sign was up on the window for about thirty minutes. (DFOF ¶ 71.) He took the sign down because he was exercising his freedom of speech. (DFOF ¶ 72.) In its complaint, Helbachs Cafe states that the "sign was a misrepresentation of our policy because we have no facial covering (mask) policy." (DFOF ¶ 75.) Nathan Helbach, in his deposition, also stated that Casey Helbach posted the sign and reiterated that Casey did not run it past him or any of the other family members who were the corporate officers. (DFOF ¶ 73.) Nathan stated that he first became aware that the sign had been posted, was when Helbachs was tagged on social media, which he runs. (DFOF ¶ 74.) At that point, the sign was already down.

Casey Helbach is not an individual plaintiff in this lawsuit. Rather, the Limited Liability Company, Helbachs Cafe, is the sole plaintiff in this lawsuit. Helbachs Cafe has not engaged in any speech, much less protected speech. Therefore, it fails to meet the first prong of its first amendment retaliation claim, and accordingly its claim fails.

<u>Second</u>, even if it is assumed the Plaintiff engaged in protected speech, the Plaintiff has not sufficiently alleged any plausible factual averments to meet the second and third requirements. Any alleged speech was not the motivating factor in the decision to issue the citations and the Notice of Intent to Revoke License to the Plaintiffs. All three of the citations that were issued to the Plaintiff because of its failure to comply with the requirements of Emergency Order # 8. Further, none of the citations were issued in response to Plaintiff's exercise of its free-speech rights in relation to the "mask free zone" sign nor did any of the citations have anything to do with Helbachs Café's freedom of speech.  Each involved, upon receiving hundreds of citizen complaints about the business' noncompliance with public health orders in the midst of a pandemic, the failure to post signage about facial coverings and about requiring a patron to remove a face covering. The Plaintiff has pointed to the timing of the citations to attempt to establish its First Amendment Retaliation claim. However, the Seventh Circuit has noted that suspicious timing "is not enough to establish that speech was a motivating factor." *Smith v. Dunn,* 368 F.3d 705 (7th Cir. 2004).

Moreover, the Plaintiff has not been deterred from First Amendment activity. In fact, the Plaintiff has been actively engaging in its first amendment free speech by actively posting about their disagreement with the PHMDC health orders on its website and on its Go Fund Me page. (DFOF ¶ 120, 121.) To the extent that the Plaintiff believes the Notice of Intent to Revoke License in any way restricted their freedom of speech, clearly it did not stop them from doing so based on the Go Fund Me Page, which reflects the company had various ways in which to express disagreement with public health orders.  The same can be said of the company's appearance on a radio talk show host,[10] meetings with PHMDC officials[11] and other ways the company voiced its

---

[10] DFOF ¶ 122.
[11] DFOF ¶ 116.

opinions.[12]   In sum, no reasonable juror could conclude Helbachs Café was deterred in First Amendment activity.

Third, the Plaintiff has not, and cannot, show any evidence that the First Amendment activity was at least a motivating factor in PHMDC's decision to take the retaliatory action. PHMDC received hundreds of complaints regarding Helbachs Cafe. Although some of the complaints referenced the "mask-free zone" sign, many were unrelated and reported that Helbachs Cafe was not in compliance with Emergency Order # 8 for other reasons including: employees not wearing masks indoors, employees making and serving food with no masks, no social distancing, capacity exceeding the limitations, employees treating people who wear masks poorly, employees actively telling people not to wear masks,  lack of signage regarding masks and social distancing, etc. (DFOF ¶ 78.)

PHMDC issued the Plaintiff three citations, after it educated the Plaintiff of its violations under Emergency Order # 8. The Plaintiff refused to comply with the Order and was issued citations in response to its noncompliance. None of the citations that were issued to Plaintiff had anything to do with Plaintiff's exercise of its First Amendment activity and all of the citations would have been issued regardless because the Plaintiff had been violating Emergency Order # 8. See Aff. Paulsen, ¶ 29, 37, 39.

The Plaintiff also cannot prove that the Notice of Intent to Revoke would not have been issued "but for" Helbachs Cafe's "mask-free zone" sign being posted. In fact, PHMDC would have moved to revoke the Plaintiff's Food and Drink License regardless of the mask free zone sign that was posted because again, the Plaintiff repeatedly refused to comply with Emergency Order # 8

---

[12] DFOF ¶ 120, 121.

for wholly separate reasons, not the least of which was the refusal abide by the facial coverings requirements that every other business in the country fulfilled.

### 3. Plaintiffs' Taking Claims, Under the Fifth Amendment, Are Unlikely to Succeed on the Merits

The Fifth Amendment Takings Clause provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. There are two recognized categories of takings: (1) physical takings and (2) regulatory takings. The Plaintiff's case does not implicate a physical taking, as PHMDC has not physically occupied the Plaintiff's business.

Here, the Plaintiff has alleged that Emergency Order # 8 constitutes a regulatory taking of property. (Dkt. 1, Exhibit B, Complaint, pg. 22.) There are two lines of cases that discuss where to draw the line between legitimate government regulation and regulatory takings. One line involves categorical takings, whereby a regulation "deprives an owner of '*all* economically beneficial uses' of his land." *Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330, (2002). A categorical taking occurs "in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted" by the regulation or ordinance. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1017 (1998). This case does not involve this kind of taking because the Defendants did not physically appropriate the business nor did the health order requirements – requiring only facial coverings and signage related thereto – take all use or value of the business.

A regulatory taking is an interference with property rights that "arises from a public program adjusting the benefits and burdens of economic life to promote the public good[.]" *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, (2002). The Supreme Court has articulated two guidelines for determining when a regulation is so burdensome that it constitutes a

taking. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). "First, 'with certain qualifications ... a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause.'" *Id.* at 1942–43 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)). If the regulation does not deny all economically beneficial use of the land, courts are instructed to weigh factors including: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action." *Id.* at 1743 (citing *Palazzolo,* 553 U.S. at 617).

The Plaintiff's takings claim cannot succeed for several reasons. <u>First</u>, the challenged provisions of the public health order in this case – requiring facial coverings and signage related thereto, as well as enforcement thereof – does not constitute affirmative government action to effectuate a taking.  It is telling that no federal court addressing such COVID-19 health orders of all scope, nature or duration have not concluded they are aimed at or effectuate a taking.   The dearth of such case law is unsurprising because there needs to be affirmative action, whether through a regulation or otherwise, to have a taking.  See, e.g., *Sunflower Spa LLC v. City of Appleton*, Case No. 14-C-861 (E.D. Wis. 2015) (observing general rule there must be "government action" to effectuate a takings and observing "[b]ut foreseeability— a classic negligence standard—is a far cry from intent or authorization."); *Fromm v. Vill. of Lake Delton*, 2014 WI App 47, ¶ 32 (Wis. Ct. App. 2014) ("We are not free to disregard this plainly stated rule and search for inaction that might be considered to be the functional equivalent of action, as might be at issue for example in the negligence context.").

Here, the challenged restrictions applied universally across all businesses in the county. If PHMDC's orders can be construed as a regulatory taking, it would require PHMDC to compensate

every individual or property owner whose property use was restricted in any fashion for the purpose of protecting public health.

    Second, the Takings Clause does not render every government action a taking just because it has a detrimental effect on the owner's property or its profitability – there must be deprivation of all economic value and use.  The Plaintiff has not plausibly alleged a deprivation of all economically beneficial use of its property. Simply alleging damage or negative economic impact to businesses is not enough.  Additionally, since the filing of this lawsuit, Helbachs Cafe has reopened its business and operations have resumed as normal. Thus, clearly barring them from bringing such a claim that they lost all economically beneficial use of the business. "Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal*., 508 U.S. 602, 645 (1993). Many regulations are not takings even when they prohibit the landowner from making "the most beneficial use of the property"—that is, the most value-producing use. *Penn Cent. Transp. Co*., 438 U.S. at 125, (Where a state "reasonably conclude[s] that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land," the state is not required to provide just compensation to the citizens affected by the regulation.); *E-L Enterprises, Inc., v. Milwaukee Metro. Sew. Dist.,* 326 Wis. 2d 82, 105 (2010) (consequential damages within" does not constitute a taking) (citing *Loretto v. Teleprompter Manhattan.,* 458 U.S. 419, 428 (1982)).

    As noted, takings claims that have been brought during the pandemic in relation to public health orders have failed to achieve relief in other federal courts. For example, in *TJM 64, Inc. v. Harris,* 475 F. Supp. 3d 828, 832 (W.D. Tennessee, Western Division, 2020), on July 8, 2020, the Shelby County Health Department issued a health order requiring all bars and restaurants to shut

down for 45 days because of a spike in COVID-19 cases in the county.  The Plaintiffs, a group of restaurant owners, brought this lawsuit, seeking a temporary injunction, alleging that the order constituted a regulatory taking. *Id.* The court held that the plaintiff was unlikely to succeed on the merits of their claim because a total loss only occurs if the property has no productive or economically beneficial use and held that Plaintiffs had not shown that their properties had lost *all* economic value. *Id.* at 835.

Also, in *McCarthy v. Cuomo,* 2020 WL 3286530, *1 (E.D. New York, 2020), Governor Cuomo issued a series of emergency orders, placing restrictions on individuals and businesses. Sean McCarthy d/b/a Blush Gentleman's Club claimed he suffered catastrophic financial losses due to the orders. His complaint alleged eleven causes of action, including a Fifth Amendment takings claim. *Id.* at * 3. The court stated that the emergency orders did not plainly deny McCarthy all economically beneficial use of his property because he could have offered food and drinks for take-out or delivery and stated that if McCarthy has lost all income from his club, that is a result of a voluntary choice not to pursue alternative business models. *Id.* at *5. The court ultimately held that the Takings Claim was unlikely to succeed on the merits. *Id.*

The Plaintiff's property was not substantially impacted by Emergency Order # 8 or any of its requirements in a way to effectuate a taking. Nor has the Plaintiff been deprived of all or substantially all beneficial use of its property because the Plaintiff remains able to enjoy its property and use it as a coffee house, as it has been doing since its opening. Further, the requirement that a business post a sign stating that the premise requires masks to be worn does not impede upon or prevent the Plaintiff's from using or enjoying their property in any way.  Thus, the takings claim fails as a matter of law.

#### IV.     JANEL HEINRICH AND BONNIE KOENIG SHOULD BE DISMISSED FOR LACK OF PERSONAL INVOLVEMENT.

Even assuming there were any viable constitutional claims, Plaintiff would need to connect those claims with the personal involvement requirement of 42 U.S.C. § 1983. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). In other words, only persons who cause or participate in the violations can be held liable. *See Greeno v. Daley,* 414 F.3d 645, 656-57 (7th Cir. 2005); *Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987) ("Each individual defendant can be liable only for what he or she did personally, not for any recklessness on the part of any other defendants, singly or as a group.").

While Ms. Paulsen as legal counsel had a role in consultation on the citations and the Notice of Intent to Revoke and attended one site inspection, the other defendants' roles are much more limited.  As an example, Janel Heinrich's involvement in this case is limited to the issuance of the Emergency Orders and the fact that she, as the Director of PHMDC signed the Notice of Intent to Revoke License. The decision to issue citations was not Ms. Heinrich's decision and she was not involved in the observation or issuance of any of the three citations, that were given to Plaintiff. Accordingly, Ms. Heinrich should be dismissed from this lawsuit.

Additionally, Bonnie Koenig's involvement in this case is limited. She conducted two compliance checks: one on July 14, 2020 and one on July 15, 2020. All Ms. Koenig did was observe the Plaintiff's violations of Emergency Order # 8. Further, she was not involved in issuing any of the citations to the Plaintiff and went on vacation starting July 17, 2020 and was out of town when the second two citations were issued. (Koenig Aff., ¶ 15.) Accordingly, Ms. Koenig should be dismissed from this lawsuit.

## V.        THE DEFENDANTS ARE PROTECTED BY QUALIFIED IMMUNITY

Governmental officials performing discretionary functions are shielded from liability insofar as their conduct does not violate any clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992); *Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997), cert denied, 522 U.S. 1117 (1998). Once raised by the defendant, the plaintiff bears the burden of defeating a defense of qualified immunity. *Weinmann, v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015.) Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law. *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011) (internal citations omitted). The Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage of the litigation." *Wood v. Moss,* 572 U.S. 744, 2056 n. 4 (2014).

A two-part test determines immunity:( 1) whether the plaintiff established a deprivation of a constitutional right; and if so, (2) whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne,* 526 U.S. 607, 609 (1999). "Clearly established" means that a constitutional right must have been identified in a particularized sense with regard to the circumstances of the alleged violation. *Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir. 1992). Under qualified immunity, government officials may be protected from liability for objectively reasonable decisions, even if the decision is later determined to be wrong. *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988); *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) (holding that when an equal protection "class of one" claim is brought under § 1983, a government official

can receive qualified immunity from suit unless he or she violated a clearly established statutory or constitutional right of which a reasonable person would have known).

For the reasons explained above, the Plaintiff cannot prove that the government officials violated a constitutional right. To the contrary, the authority cited above directs that the public health officers acted within the confines of the law when they enforced Emergency Order # 8. However, even under the second part of the qualified immunity formulation, it cannot be shown that settled law clearly informed the individual defendants that their passage of the health order's facial covering and related signage requirements, as well as their enforcement thereof, would be a violation of Helbachs Café's constitutional rights.  In August 2020, in the height of the pandemic, almost every federal court in the country was rejecting claims not dissimilar from those made here. The fact that the company here is asking this federal court to be the first in the country to rule that these individual defendants violated their constitutional rights shows that qualified immunity ought to be available to the defendants here.

## VI.    THIS COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION

Plaintiff's Claim 1 asks this Court to adjudicate the scope of the state statute governing local health officers. As previously noted, this claim need not be entertained by the federal court. Under 28 U.S.C. § 1367(c)(3) "district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction…." *See Harvey v. Town of Merrillville*, 649 F.3d 526, 533 (7th Cir. 2011) ("[T]he usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."); *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice.").

If the Court dismisses all federal claims alleged in this lawsuit, it should decline supplemental jurisdiction over Plaintiffs' state law claims. Those claims involve state statutory interpretation and are already pending in the state courts.

## CONCLUSION

For the foregoing reasons, the court should grant the Defendants' motion for summary judgment and dismiss Plaintiff's claims with prejudice.

Dated this 30th day of April, 2021.

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**

Attorneys for City of Madison, County of Dane, Janel Heinrich, Marci Paulsen, and Bonnie Koenig

By: */s/ Remzy D. Bitar*
      REMZY D. BITAR
      State Bar No: 1038340
      SADIE R. ZURFLUH
      State Bar. No: 1115432

      730 North Grand Avenue
      Waukesha, WI 53186
      O:(262) 548-1340
      F:(262) 548-9211
      E:rbitar@ammr.net
      szurfluh@ammr.net