IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HELBACHS CAFÉ, LLC,

                              Plaintiff,                          OPINION AND ORDER

        v.                                                        20-cv-758-wmc

CITY OF MADISON, COUNTY OF
DANE, JANEL HEINRICH, MARCI
PAULSEN and BONNIE KOENIG,

                              Defendants.

---

Plaintiff Helbachs Café, LLC ("Helbachs"), a coffeeshop operating in Madison, Wisconsin, brought this civil rights action under 42 U.S.C. § 1983 against the City of Madison, Dane County, Madison Assistant City Attorney Marci Paulsen, and Public Health Madison & Dane County ("PHMDC") employees Janel Heinrich and Bonnie Koenig, all in their official capacities.  Specifically, Helbachs asserts that during the summer of 2020, defendants violated its rights under the First Amendment and Fourteenth Amendment by enforcing Dane County Emergency Order #8 ("the Order"), which required masks be worn in indoor, public and commercial spaces and that businesses post signs requiring the wearing of masks in response to the COVID-19 pandemic.  Helbachs further claims that (1) the issuance of the Order exceeded the power of PHMDC; (2) the Order was enforced without providing sufficient notice; and (3) the Order violates the non-delegation doctrine.

Before the court are the parties' cross motions for summary judgment.  (Dkt. ##16, 30.)  The court finds plaintiff Helbachs has failed to put forth sufficient evidence from which a reasonable jury could find any violation of its rights were the result of a policy,

custom or practice, or other action satisfying the requirements of *Monell v. Department of Social Services*, 436 US 658 (1978). The court further finds that Helbachs federal constitutional claims fail for other, independent reasons. For reasons explained in greater detail below, therefore, the court will grant defendants' motion for summary judgment on all federal claims, while declining to exercise supplemental jurisdiction on plaintiff's remaining state law claims.

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiff Helbachs is a limited liability company formed in 2016 and authorized to conduct business in the state of Wisconsin. Nathan Helbach is its chief executive officer, and Casey Helbach, Nathan's father, is the company's chief financial officer. The café itself is managed by Casey, Melissa Helbach, Nathan's mother, and Joshua Helbach, Nathan's brother. These four Helbachs comprise the LLC's entire membership.[2]

In July of 2020, during the incidents that form the basis of this lawsuit, Helbachs Café operated out of a location at 1824 Parmenter Street in Middleton, although it currently operates at 410 D'Onofrio Drive in Madison. The court takes judicial notice that both of these addresses are located in Dane County, Wisconsin.

As previously noted, the named defendants consist of two government entities -- the City of Madison and Dane County -- and three individuals -- Madison Assistant City

---

[1] Unless otherwise noted, the following facts are material and undisputed.

[2] For ease of reference, the court will refer to the members of the LLC by their first names.

Attorney Marci Paulsen and PHMDC employees Janel Heinrich and Bonnie Koenig.  All three of the individual defendants were named in their official capacity.

### B. The Issuance of Dane County Emergency Health Order #8

In March of 2020, a then novel strain of coronavirus, now commonly referred to as COVID-19, began to spread throughout the United States.  The epidemiology of COVID-19 suggested that the disease spreads through close contact with infected persons, including airborne transmissions via respiratory droplets created by activities such as sneezing, coughing, speaking and breathing.  In response, Wisconsin Governor Tony Evers declared a public health emergency in the State of Wisconsin on March 12, 2020.  Instituting several, statewide emergency health orders aimed at curbing infection rates, including a statewide mandate that masks be worn in public and commercial spaces.

On April 1, 2020, however, the Wisconsin Supreme Court invalidated a number of these health orders, including the statewide mask mandate.  In response to this and other rulings striking down statewide emergency health orders, many Wisconsin counties and municipalities began enacting their own local health orders.  Among those, PHMDC Emergency Order #8 was enacted on July 7, 2020, and applied to all persons in Dane County.  (Heinrich Aff., Ex. 9 (dkt. #34-9).)  That Order stated that face coverings were required effective July 13, 2020, "In any enclosed building where other people, except for members of the person's own household or living unit, could be present." (*Id*.)  The Order also included specific directives to businesses, including limiting capacity to 50%, adhering to the "PHMDC requirements" listed on its website, and posting PHMDC's "Workplace

Requirements for Employers and Workers" guidance document in a prominent location for employees to see. (*Id.*)[3]

If persons in Dane County observed what they believed to be a violation of *any* PHMDC health order by a commercial business, they were encouraged to lodge a complaint by telephone or email. Upon receipt of a complaint against a business, PHMDC's policy was first to reach out to the business, provide education regarding the requirements of the health orders, and attempt to obtain voluntary compliance. If PHMDC received a second complaint, however, its policy was to have someone from the City Attorney's office follow up with that business to discuss the importance of its compliance. Moreover, receipt of a third complaint generally resulted in a citation, and receipt of any subsequent complaints could result in an onsite visit by PHMDC officials. Finally, if these officials observed continued violations of a health order, the matter is referred to the City Attorney's office for prosecution.

### C. Helbachs Café's Interactions with PHMDC and Resulting Citations

On July 13, 2020, the day that PHMDC Emergency Order #8 went into effect, Casey Helbach posted a sign on the front door of the café stating, "This is a Mask Free Zone. Please remove mask before entering." Casey did not confer with any other members of Helbachs Café, LLC before making and posting the sign. Moreover, the sign was on the

---

[3] The parties dispute whether the PHMDC's first version of the Order that took effect on July 13th expressly required posting a "Masks Required" sign at entrances or whether that requirement was added at a later date to the list of "PHMDC requirements" on the website. However, the parties agree that as of July 16, Emergency Order #8 encompassed a requirement to post a "Masks Required" sign.

door for approximately thirty minutes before Casey took it down, again without input from any other LLC member.  Nevertheless, as fate would have it, a patron took a photo of the sign during the short time that the sign was up, then posted it to social media, which garnered thousands of reactions, comments and shares, as well as commentary from local and national media.

Beginning midday on July 13, PHMDC also began receiving complaints regarding Helbachs' noncompliance with the Emergency Order, eventually totaling over 150. Plaintiff disputes the characterization of these calls and emails as "complaints" -- at least to the extent that persons lodging the complaints were not speaking from first-hand knowledge, but rather from what they saw on social media -- but the parties agree that PHMDC was contacted over 150 times regarding the café's lack of compliance with Emergency Order #8.  Moreover, due to the sheer volume of these contacts, PHMDC sent two employees, Bonnie Koenig and Molly Budlong, to Helbachs for a compliance check on July 14.  Koenig and Budlong observed that café employees were not wearing masks, and they further noted that neither the "Masks Required" sign nor the "Workplace Requirements for Employers and Workers" sign was posted in the café.  On this initial occasion, however, Koenig and Budlong only *observed* the café, choosing not to make contact with a manager or any of its employees.

Later that same day, Koenig attempted to call the café, as well as Casey personally, to provide education on the requirements of Emergency Order #8, leaving voicemails at both phone numbers.  Koenig also emailed Helbachs to convey the same information.  The next day, July 15, having received no reply to either of her calls or the follow-up email, and

5

with PHMDC itself receiving more calls and emails regarding Helbachs, Koenig returned to the café with City of Madison Assistant City Attorney Marci Paulsen and spoke with Casey.  Both Koenig and Paulsen attempted to educate Casey on the importance of following the provisions of Emergency Order #8.  However, Casey told Koenig and Paulsen that he not only had no intention of complying, but would not require employees or patrons to wear masks, nor would he post either of the required signs.  Casey further admits Helbachs "did nothing" in response to Koenig and Paulsen's requests that the café comply with Emergency Order #8, and Helbachs continued operating the café without requiring masks for employees or patrons and without posting the required signage.

On July 16, PHMDC sent an email to all businesses in its listserv, including Helbachs, reminding them that Emergency Order #8 required them to post the "Mask Required" signage for workers or patrons.  This email was received and opened by josh@helbachscoffee.com.

On July 20, 2020, PHMDC received a complaint from a Kathryn Vellon, who claimed that an employee at Helbachs asked her to *remove* her mask while in the café.  Assistant City Attorney Paulsen spoke with Vellon to verify her complaint.  While plaintiff purports to dispute whether the investigation conducted into the incident with Vellon was thorough enough, there is *no* dispute that Paulsen spoke with Vellon regarding her complaint.  Based on this complaint, and in accordance with PHMDC policy for businesses receiving three or more complaints, Paulsen next authorized a citation for violation of Section 1(e)(i)(1) of Emergency Order #8.  The space on the citation marked "Description

of Violation" reads, "Asking an individual to remove her face covering in violation of Emergency Order #8 Sec. 1(e)(i)(1)." (Paulsen Aff., Ex. 3 (dkt. #33-3).)

On July 21, Paulsen and Budlong once again visited Helbachs, and they again observed that the café had still not posted either of the required signs, despite Paulsen's earlier visit and admonitions to Casey Helbach on July 15. Accordingly, Paulson and Budlong issued a second citation to the café for violating the Order, this time for failure to post the required signage, although inexplicably the date of the violation on that citation was recorded as July 15, 2020.

On July 23, PHMDC employee Doug Voegeli went back to Helbachs to serve the July 20th citation Paulsen had authorized. While there, Voegeli also observed that neither of the required signs had been posted, and employees and patrons were still not wearing masks. Voegeli then asked the manager on duty to post both the "Masks Required" sign and the "Workplace Requirements for Employers and Workers" sign, while attempting to explain the importance of compliance with Emergency Order #8. However, the manager once more refused to post the signs, and Voegeli served the café with both Paulsen's July 20 authorized citation and a second citation for failure to post required signage dated July 23.

On July 24, Paulsen returned to Helbachs Café, this time to deliver a letter requesting a meeting between Helbachs and PHMDC to discuss their non-compliance with Emergency Order #8, which Helbachs agreed to attend. The next day, on July 25, Nathan Helbach walked around to businesses surrounding the café, observing that 14 of those businesses were also not in compliance with Emergency Order #8's requirement that

retailers post "Masks Required" signs, although PHMDC had *not* received any complaints about those businesses Nathan observed.

The Helbachs met with PHMDC officials via Skype on July 28, 2020, but continued to refuse to comply with Emergency Order #8 following this meeting, prompting PHMDC to issue a Notice of Intent to Revoke License to Helbachs on August 3, 2020.  The Notice indicated PHMDC's intention to revoke Helbachs' license for violation of Dane County Code of Ordinances 46.40(2), which states, "It shall be a violation of this chapter to refuse to obey an Order of the Director of Public Health Madison and Dane County entered to prevent, suppress or control communicable disease pursuant to Wis. Stat. 252.03." (Heinrich Aff., Ex. 10 (dkt. #34-10).)  The Notice also listed seven, separate violations: the posting of the "Mask Free Zone" sign on July 13; the July 20th incident where patron Vellon was asked to remove her mask; and PHMDC employee observations of employees and patrons not wearing masks in the café and refusing to post required signage on July 14, 15, 21, 23, and 24.  (*Id*.)[4]  To avoid revocation of the license, the Notice further advised Helbachs that it must comply with Emergency Order #8, as well as "refraining from posting or communicating that the premises is a "'mask free zone.'" (*Id*.)  A hearing regarding the notice was scheduled for August 25, 2020.

After receiving that notice, Helbachs retained counsel and filed this lawsuit, seeking a motion for temporary injunctive relief enjoining PHMDC from enforcing its health orders, as well as declaratory relief that:  (1) Helbachs had not violated any provision of

---

[4] The court notes that the posting of the "Mask Free Zone" sign was noted in the Notice of Intent to Revoke, but Helbachs did not receive a citation for having posted this sign.

Emergency Order #8; and (2) any citations issued were invalid.  On August 19, Helbachs

withdrew its motion for temporary injunctive relief but proceeded with its claims on the

merits.  Upon filing of this lawsuit, the August 25th revocation hearing was also cancelled,

and PHMDC did not proceed with the license revocation.[5]

OPINION

A court will grant a motion for summary judgment when there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a).  In considering a summary judgment motion, the court must view disputed

facts in a light most favorable to the non-moving party.  However, the court need not draw

inferences in the non-moving party's favor when only supported by speculation or

conjecture.  *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

## I.  *Monell* Liability

To sue a municipal employee in their official capacity or to sue the municipality

itself, a plaintiff must show that the employee violated a constitutional right by executing

the government's policy or custom.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Accordingly, courts recognize three main theories of liability for such a suit to proceed:

"(1) an express policy; (2) 'a widespread practice that, although not authorized by written

law or express municipal policy, is so permanent and well settled as to constitute a "custom

---

[5] Around this same time, Casey created a "Go Fund Me" page titled, "Helbachs Coffee Freedom Fund" for the purpose of raising money for the lawsuit against PHMDC.  (Zurfluh Aff., Ex. 3 (dkt. #35-1).)  That page includes a lengthy summary of Helbachs' legal arguments in this suit, as well as messages thanking supporters and inviting them to a "freedom party" at the café's new location in Madison on April 1, 2021.  (*Id.*)

or usage" with the force of law'; or (3) [the violation is] caused by a person with 'final policymaking authority.'" *McTigue v. City of Chi.*, 60 F.3d 381, 382 (7th Cir. 1995) (internal citations omitted).  Additionally, a municipality may be liable for a failure to train employees that amounts to deliberate indifference to constitutional violations committed by those employees. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

In their opening brief in support of summary judgment, defendants pursued qualified immunity as a defense.  In its opposition, however, plaintiff clarified that its claims were asserted against the individual defendants in their official capacity only and are, therefore, duplicative of the same claims asserted against the two municipal defendants -- Dane County and the City of Madison.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  In their reply brief, defendants now argue that plaintiff has failed to plead, as well as present evidence from which a reasonable jury could find, the necessary elements under *Monell*.  Because plaintiff had no opportunity to respond to this specific argument, the court granted plaintiff leave to file a supplemental brief on the *Monell* defense only, which it has now done.  (Dkt. #60.)  Moreover, defendants also requested leave to file a reply brief, which the court will grant only as to the *Monell* issue and has also reviewed. (Dkt. #62.)  With that context aside, the court now turns to plaintiff's arguments.

Plaintiff Helbachs does not choose a single theory to pursue defendants Heinrich, Paulsen, and Koenig in their official capacity, but rather argues that they executed government policies under all recognized theories of *Monell* liability.  Specifically, plaintiff contends that:  (1) Emergency Order 8 was an express policy that violated its First

10

Amendment right to free speech; (2) the county's procedure for investigations regarding violations of Emergency Order 8 was a widespread practice that violated its Fourteenth Amendment right to Due Process;[6] (3) its failure to train and supervise employees led to a violation of some unspecified right; and (4) Heinrich and Paulsen are final policymakers whose decisions violated its Fourteenth Amendment right to Equal Protection by being singled out as a class of one.  Although none of these theories have merit, the court will address each separately.

## A. Emergency Order 8 as Policy

A plaintiff can show that a municipality is liable under an express policy theory of *Monell* liability if it can demonstrate that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  Plaintiff Helbachs claims that the requirements in Emergency Order 8 to post PHMDC's "Workplace Requirements for Employers and Workers" sign and to adhere to PHMDC requirements, which included posting a "Masks Required" sign violated its constitutional right to free speech.  Alternatively, plaintiff claims that because this new order was instituted shortly after it posted its "Mask free zone" sign, defendants created the requirement to punish plaintiff and "ensure only speech they supported was posted by a business."  (Pl.'s Suppl. Br. (dkt. # 60) 2.)

---

[6] Although plaintiff failed to allege a violation of this constitutional right in its complaint or any earlier submissions, the court will address it on the merits.

Importantly, plaintiff concedes that a requirement that a commercial business post signage is constitutional; instead, it argues a single statement taken from Heinrich's deposition -- that the "Mask free zone" sign was impermissible because it contradicted the message of the Order's required signs -- discloses an express policy *within* Emergency Order 8 that restricts contrary speech. (Pl.'s Suppl. Br. (dkt. #60) 3.)  This argument fails on at least three levels.  First, nowhere in the Order does it state that businesses *cannot* post certain types of signage; it only states that it *must* post other types.  Second, the "express policy" that plaintiff claims restricts its free speech is based on a lone statement from the deposition of one PHMDC employee, which cannot be classified as a policy statement, ordinance, regulation or decision officially adopted by lawmakers.  Rather, it is accurately characterized as a decision by a government actor, not an express policy.  Third, the *actual* government action that plaintiff opposes in this lawsuit is the speech restriction imposed on it through the Notice of Intent to Revoke License, not through Emergency Order 8. Regardless, plaintiff has produced *no* evidence from which a reasonable jury could find an express *policy* in place that imposed speech restrictions on businesses generally.

**B. PHMDC Investigation Procedure and Practice of Pre-writing Citations**

Although not expressly pleaded, plaintiff also claims that PHMDC's process for investigating complaints and issuing citations violated its Fourteenth Amendment right to due process, as well as punished it for exercising its First Amendment right to free speech. This argument also fails for at least two reasons:  (1) the complaints alone led to *no* adverse action against Helbachs; and (2) the pre-writing of citations did not harm Helbachs, or at least plaintiff has failed to explain or provide a basis for a reasonable jury to so find.

12

A municipality can be held responsible for a constitutional violation if a plaintiff shows "the existence of an official policy or other governmental custom that not only causes but is the *moving force behind* the deprivation of constitutional rights." *Wilson v. Cook Cnty.*, 742 F.3d 775, 779 (7th Cir. 2014) (emphasis added). In this case, plaintiff has failed to put forth sufficient evidence for a reasonable jury to find that the complaint investigation system was the moving force behind the citations issued to plaintiff Helbachs. To the contrary, while plaintiff's brief attempt at humor may have (intentionally or not) made it a cause célèbre among thousands who felt strongly for or against mask mandates, the record is overwhelming that Helbachs' own hubris in repeatedly refusing to comply with the Order's basic requirements, despite repeated warnings, resulted in issuance of a series of citations.

In response, plaintiff simply asserts that there is an uncodified practice under which "complaints were assumed to be true in every instance, resulting in enforcement actions against individuals, and businesses, who had unwarranted and unsubstantiated complaints lodged against them." (Pl.'s Suppl. Br. (dkt. # 60) 3.) However, the undisputed record provides no evidence for this sweeping assertion. Instead, there is no dispute that PHMDC's policy to enforce Emergency Order 8 involved receiving complaints from citizens, investigating the complaint on site, and *potentially* issuing a citation, based on the results of the investigation. (Voegeli Dep. (dkt. #47) at 10-11.) Similarly, in this case, an unsubstantiated complaint alone would not, *and did not*, lead to a citation, or at least plaintiff has failed to advance any evidence otherwise, much less create a material factual dispute on this point. Indeed, the citations actually issued to Helbachs were for:

"[f]ail[ing] to post signage required under Emergency Order 8 4.i & 4.k"; "asking an individual to remove her face covering"; and "failure to post signage in violation of Emergency Order #8 sec 4.i&k." (Eisberner Aff., Exs. 4-6 (dkt. ##19-4 to 19-6).) While Helbachs is correct that a substantial number of complaints resulting in investigations mentioned the "mask free zone" sign, which had initially pulled the café into a larger political maelstrom over mask wearing mandates (willingly or not), the record establishes that those complaints were *not* the basis for issuance of any citations.

Rather, Helbachs decided to disregard Emergency Order 8 within its premises despite its owners and employees being informed personally and repeatedly of the requirements to post the "Mask Required" signage on July 15, July 16, July 21, July 23, July 24, and July 28. (Defs.' PFOFs (dkt. #39) ¶¶ 87-92, 94-95, 103-05, 108-115.) Even if investigators might not have been on sight to observe these violations, *Monell* requires the government policy to be the "moving force" behind the injury, 436 U.S. at 694, and the general complaints of third-parties were not the "moving force" behind the violations; instead, Helbachs' deliberate, repeated refusals to conform its conduct with the law was. *See also Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) ("[T]here is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself. Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a 'but-for' sense."). Similarly, whether it exists at all, any policy of pre-writing citations did not cause an injury, since the investigation procedure as a whole still required the finding of a violation to issue the citation.

14

## C. Failure to Train Theory

Plaintiff next argues that defendants are liable under *Monell* because they failed to train their employees adequately in deliberate indifference to the likelihood that they might cause a constitutional violation.  Broadly speaking, plaintiff alleges, "it is obvious that there was no formal training given to the 'investigators' who received and 'investigated' citizen complaints" and that "this 'compliance team' was wholly without any formal training."[7] (Pl.'s Suppl. Br. (dkt. #60) 5-6.)  Plaintiff then revisits its general discontent with the procedure for investigating citizens that "resulted in fines being levied" and contends that "training would have prevented an army of angry online personas from being able to utilize PHMDC as a weapon to intimidate . . . businesses." (*Id.* at 6.)  As explained in the previous section, however, the employees followed the investigation procedure for complaints, and despite the hundred-plus complaints received, only three citations were issued, two of them for the demonstrable failure to post required signs and one upon investigation by Assistant City Attorney Paulsen following a specific complaint by a patron that she had been affirmatively instructed by a Helbachs' employee to remove her mask.  (Voegeli Dep. (dkt. #47) 35-36.)

---

[7] The excessive use of quotations in Section 3 of plaintiff's supplemental briefing reflects a degree of sarcasm that has no place in court filings.  Plaintiff also purports to support these claims of "no formal training" within the compliance team by mischaracterizing testimony from the Voegeli Deposition. (Pl.'s Suppl. Br. (dkt. #60) 6 (emphasis in original) (citing Voegeli Dep. (dkt #47) 47:3-7).)  For example, plaintiff represents that the compliance team "was wholly without any formal training or supervision to investigate complaints" (Pl.'s Suppl. Br. (dkt. #60) 6), while the full quote from Voegeli was actually "No, I wouldn't say formal [training]. Semiformal with our attorney. Also, the people that are in that section are sanitarians, and sanitarians are trained in conducting inspections of restaurants.  And so they know, you know, how to write violations and how to observe violations" (Voegeli Dep. (dkt. #47) 47).

Thus, plaintiff points to nothing in support of its argument that the complaints were presumed to be true; instead, the record reflects that the complaints were investigated. That Helbachs does not like the procedure for conducting investigations on the basis of complaints actually received does not mean that employees following that procedure received inadequate training, or again, at minimum, plaintiff has failed to put forth sufficient evidence from which a reasonable jury could find defendants' deliberate indifference to training was a cause of its alleged constitutional injury.

In the end, plaintiff's primary complaint seems to be that a large number of the complaints received by PHMDC employees pertained to the "mask free zone" sign that was in its window for a very short period of time.  Plaintiff further claims, and the court agrees, that not all of these complaints could have been firsthand.  Regardless, the nature of public complaints does not bear on the legitimacy of the official investigation that followed.  While Helbachs issued a provocative statement that gained positive and negative traction on social media by private citizens, to the extent some of those private citizens listed that sign's statement as a reason for PHMDC to *investigate* Helbachs for compliance, among others, any ultimate action against Helbachs independently resulted from later non-compliance with Order No. 8 actually observed by investigators, not from some vague, alleged failure to train or failure to investigate properly.

### D. Decisions of Policymakers

Finally, plaintiff argues that the City of Madison is liable under *Monell* for injuries caused by actions of "final policymakers" Madison Assistant City Attorney Paulsen and PHMDC Head Janel Heinrich.  A municipal official is considered a final policymaker if she

has final decision-making authority in a particular area or on a particular issue.  *See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009).  To determine whether an official has final decision-making authority, a court may consider:  "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Id.* (internal citations omitted).  As with other theories of liability under *Monell*, the policy in question must also be the "moving force" behind the constitutional injury.  *Monell*, 436 U.S. at 694.

Plaintiff contends that the unreviewable decisions of these two officials to issue citations and a Notice of Intent to Revoke License caused it harm in the form of "the shuttering of its business, as well as the loss of its lease, loss of employees, loss of revenue, and loss of reputation within the community."  (Pl.'s Suppl. Br. (dkt. #60) 10.)  However, the undisputed record demonstrates that *both* Heinrich and Paulsen were expressly constrained by other authorities, making their decisions subject to meaningful review.  First, plaintiff argues that Heinrich is a final policymaker whose decision to issue the Notice of Intent to Revoke License was not reviewable, while the express language of the Notice itself establishes a date and time for a hearing before the Board of Health for Madison and Dane County for review.  (Eisberner Aff., Ex. 7 (dkt. #19-7) 4.)  Moreover, the hearing process shows that Heinrich *was* constrained by other officials, and an opportunity for a meaningful review of her decision was provided.  Thus, the Notice does *not* and did not alone lead to the revocation of Helbachs' license.

17

Helbachs also argues that Paulsen is a final policymaker whose orders to issue pre-written citations were not subject to review.  However, similar to the Notice of Intent to Revoke License, the citations issued provide a date for a hearing, at which time the Helbachs could have contested the validity of the citations before the Dane County Circuit Court.  (*Id.*, Exs. 4-6 (dkt. ##19-4 to 19-6).)  Furthermore, Wisconsin statutes provide a process by which a party may have an administrative decision against it reviewed.  Wis. Stat. §68.01.  As such, plaintiff cannot show that Heinrich and Paulsen are final policymakers because their decisions are constrained by other municipal authorities and are subject to meaningful review.[8]

## II. Merits of Constitutional Claims

Even if plaintiff were able to point to a municipal policy practice or other action that a jury might reasonably find satisfied the requirements for *Monell* liability, plaintiff has failed to offer evidence at summary judgment from which a reasonable jury could find that its constitutional rights were violated.

### A. First Amendment Retaliation Claim

In order to prevail on a First Amendment retaliation claim, a plaintiff must show (1) that it engaged in activity protected by the First Amendment; (2) it suffered a deprivation that is likely to deter future exercise of First Amendment freedoms; and (3)

---

[8] For this same reason, plaintiff also has failed to put forth sufficient evidence from which a reasonably jury could conclude that the decisions of Heinrich or Paulsen were the moving force behind any constitutional injuries.

the First Amendment activity was a motivating factor in defendants' decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Whether the speech is protected is a question of law for the court. *Kubiak v. City of Chi.*, 810 F.3d 476, 481 (7th Cir. 2016). Plaintiff cannot prevail on its retaliation claim because the speech in question was not protected and as such, any action taken by the defendants would not deter future First Amendment activity.[9]

With limited exceptions, plaintiff principally argues that the First Amendment protects its right to post any sign with any message it may choose because "signs are a form of expression protected by the Free Speech Clause," and there is no ordinance or law empowering the city to determine whether a sign violates an ordinance or law. (Pl.'s Opening Br. (dkt. #17) 12 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43 (1994)).) However, the Supreme Court in *Ladue* struck down an ordinance restricting all yard signs because it completely foreclosed the use of an important medium of communication. *City of Ladue*, 512 U.S. 43. A single, out-of-context quote from that case about the restriction of communication media does not bear on the constitutionality of a targeted, content-based restriction. Here, unlike the City of Ladue, the City of Madison did not forbid *all* signage on private property; instead, it determined that this individual sign created a public health risk by encouraging others to flout COVID safety measures. Accordingly, Helbachs' argument that defendants do not have the explicit authority to regulate signs oversimplifies

---

[9] Defendant attempts to argue that the "Mask Free Zone" sign is not at issue here because it was Casey Helbach's speech, who is not a named plaintiff, and as such Helbachs cannot show that *its* speech led to a retaliatory deprivation. The court is unpersuaded by this argument as Casey Helbach is a part-owner and manager of the business, who acted with apparent authority as its agent in posting a sign in the cafe's' window.

the broader question of what actions fall within a municipality's realm of authority, including the scope to which it can regulate speech. As such, Helbachs' assertion that the First Amendment protects its "mask free zone" message because it was on a sign is irrelevant to the determination of its status as protected or unprotected speech.

Perhaps anticipating this ruling, plaintiff alternatively argues that because the sign's content was not "obscene, defamatory, a true threat, nor did it incite violence," it did not fall within one of the well-recognized exceptions to First Amendment protection of speech. (Pl.'s Opening Br. (dkt. #17) (citing *United States v. Alvarez*, 567 U.S. 709, 717 (2012)).) However, in its supposed application of *Alvarez*, plaintiff again either carelessly or intentionally misstates its holding. The section of *Alvarez* that plaintiff cites actually lists speech likely to "incite imminent lawless action" as the very first category of unprotected speech. 567 U.S. at 717. Moreover, plaintiff's isolated factual assertion that the sign "did not reflect the actual policy that plaintiff has when it came to wearing masks inside" (Pl.'s Opening Br. (dkt. #17) 12), suggests that without acknowledging it, plaintiff is well aware of this exception to free speech protections. Nonetheless, plaintiff has deliberately declined to engage in any substantive discussion of the exception in favor of issuing a conclusory statement, unsupported by facts, that even if the sign expressly directed patrons to do so, its actual policy did not require people to remove their masks in the café.

Thus, disregarding plaintiff's red herring argument that the sign did not incite violence, the court will turn to its tacitly posed argument that the sign was not "likely to incite" "imminent lawless action." *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969). Courts evaluate whether speech is directed at inciting imminent lawless action by

considering whether the speech is "inseparably locked with action" and whether the action sought by speech is immediate. *United States v. Dellinger*, 472 F.2d 340, 360 (7th Cir. 1972). Speech advocating the "moral propriety or even moral necessity" of lawless action can fall within the protections of the First Amendment provided that the speaker only encourages such action in abstract and indefinite terms. *Id*. at 448; *see also Hess v. Indiana*, 414 U.S. 105, 108 (1973) (determining that the First Amendment protected a student's declaration, "We'll take the […] street later" at a protest because it only advocated such action at "some indefinite time in the future," even if the speech was directed at inciting lawless action later); *Communist Party of Ind. v. Whitcomb*, 414 U.S. 441, 450 (1974) (holding that the government could not bar communist political candidates from running for office based on a refusal to promise not to advocate government overthrow in the abstract, as opposed to advocacy of action).

In contrast, certain types of speech so clearly constitute or encourage imminent lawless action as to be a lawless action in and of itself. Federal and state statutes regulate and outright bar many of these forms of speech without encroaching on the protections of the First Amendment. For example, it is hard to imagine any court finding that the First Amendment protects blackmail, extortion, perjury, or harassment. Similarly, "the First Amendment does not necessarily pose a bar to liability for aiding and abetting a crime, even when [it] takes the form of the spoken or written word." *Rice v. Paladin Enters.*, 128 F.3d 233, 244 (4th Cir. 1997). However, the First Amendment does *not* protect speech if "the objective meaning of the words used are so close in time and purpose to [an unlawful act] as to become part of the ultimate crime itself." *United States v. Freeman*, 761 F.2d 549,

552 (9th Cir. 1985); *see also United States v. Kaun*, 827 F.2d 1144 (7th Cir. 1987) (holding that the First Amendment does not protect speech encouraging listeners to avoid income taxes in a situation where they are likely to do so); *Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) (holding that the teaching of the use, application, and making of incendiary devices was not protected by the First Amendment where speakers "know, or have reason to know, or intend[]" for the knowledge to be used unlawfully); *Rice*, 128 F.3d at 242-43 (holding that publishing a book of detailed instructions for aspiring "hitmen" made the author civilly liable for aiding and abetting a contract murderer that followed those instructions).

Whatever humorous intent Helbachs' part owner and manager Casey Helbach may have had on the morning of July 13, 2020, the First Amendment did not protect his placement of the "Mask Free Zone" sign in the front window because the *objective* meaning of those words was an instruction to patrons to engage in an unlawful action immediately upon entering the café.  Thus, the content of the sign in question went beyond protesting the county's mask policy; it directed customers to "[p]lease remove mask[s] before entering."  Whatever Casey's subjective motives, such a statement does not merely criticize a government policy, nor makes an abstract suggestion that citizens should not be wearing masks because it is wrong; in fact, it says nothing about policy or morality of the policy, it merely demands that people entering the establishment engage in an unlawful action at a specified time,:  remove mask "before entering [Helbachs]."  Unlike *Hess,* therefore, the sign proscribes the exact time and circumstance under which a person should take an unlawful action.

Moreover, even if plaintiff's speech were protected, its retaliation claim still fails. As discussed above, to prevail on a retaliation claim, plaintiff must also show that its protected speech was a substantial or motivating factor in the adverse action taken against it. *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002). If the plaintiff can do so, the burden shifts to the defendants to show that they would have taken the same action despite the First Amendment activity; and if defendants can show that, then the burden shifts back to the plaintiff to demonstrate that the cited reasons for defendants' action are pretextual. *Id*. At minimum, Helbachs' claim fails because it has not raised a genuine issue of material fact that the defendants' other justifications for issuing the Notice of Intent to Revoke License are pretextual.

Defendants offer several, plausible reasons for issuing a "Notice of Intent to Revoke License." Indeed, the Notice itself listed seven, distinct instances where Helbachs committed violations of the Order, including seven days on which employees and customers were seen not wearing masks, four instances in which a manager refused to post the required signs instructing customers to wear masks, four instances in which a manager refused to post signs listing workplace requirements for employees, one instance where an owner expressly stated he would not enforce the mask policy, and one instance in which an employee told a customer to remove her mask. (Heinrich Aff., Ex. 10 (dkt. #34-10) 2-3.) Having met their burden of producing evidence to show that they would have taken action to revoke Helbachs' license even if the sign has not been posted, the burden shifted back to the plaintiff to show that these reasons are just thin excuses. Plaintiff has not done so. Thus, even if the "mask free zone" sign were deemed protected speech, the reasons for

the issuance of the Notice of Intent to Revoke License was on the whole driven by a pattern of repeated violations of Emergency Order 8, all occurring *after* removal of the sign, repeated warnings as to the unlawful nature of employees' and patrons' failures to wear masks, *and* issuance of a series of citations for ongoing violations of the Order.  Accordingly, no reasonable jury could find that the Notice did not issue for these violations, completely apart from the original, posted sign.[10]

### B. Fourteenth Amendment Class-of-One Equal Protection Claim

Plaintiff also claims that defendants violated its Fourteenth Amendment right to equal protection under the law because they singled it out to enforce the requirements of Emergency Order 8.  To prevail under a Fourteenth Amendment Equal Protection claim as a "class of one," however, plaintiff must show that:  (1) it has been intentionally treated differently from similarly situated establishments and (2) there was no rational basis for that different treatment.  *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008).  One this record, plaintiff has failed *both* to identify similarly situated establishments and to refute the defendants' reasoning for taking action against it and not against other businesses.

First, plaintiff has offered no admissible evidence to show that there were similarly-situated businesses that were treated differently under Emergency Order 8.  For other businesses to be considered "similarly situated," a plaintiff must show that it is "identical

---

[10] This is not to hold that the sign's posting and the publicity surrounding it played no role in calling Helbachs' ongoing violations to defendants' attention, nor that they may not have been motivated in part to send a message to the community about the importance of complying with the Order's mask wearing requirement, but rather that there is absolutely no basis for a reasonable jury to find that had plaintiff simply brought itself into compliance with the law, it would still have been issued the citations, and ultimately a Notice of Intent to Revoke.

or directly comparable in all material respects" to its comparators. *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010). This is typically a fact-intensive inquiry unsuited for summary judgment. However, by plaintiff identifying no similarly situated comparator, it has failed to make even a *prima facia* claim for denial of equal protection. *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005).

In fairness, Nathan Helbach conducted his own "informal survey" on one occasion by walking around the block to see which businesses did or did not have the required signs posted and reported that fourteen did not. (Nathan Helbach Aff. (dkt. #18) ¶¶ 26-27.) However, geographic proximity and a failure to post a sign on the one day the survey was conducted is insufficient to establish that these businesses were "similarly situated" to Helbachs in a number of material respects. Specifically, Helbachs had a history of repeated violations leading up to its eventual citations and Notice of Intent to Revoke License, including personal visits to educate its owners and employees of the requirements of the Order, numerous, direct refusals to post signage at the request of county officials, numerous documented reports of customers and employees not wearing masks indoors, *and* over one hundred public complaints lodged against it. Whatever plaintiff's motives for continuing to refuse to comply or attribution of ulterior motives to defendants, each of these considerations reasonably factored into PHMDC's decision to enforce Emergency Order 8 against Helbachs, and plaintiff has not offered any evidence that any of these other businesses were similar in any of these respects. Rather, while plaintiff asserts that it "could point to countless number of businesses," it asserts that "doing so would serve no purpose." (Pl.'s Opp'n (dkt. #44) 15.) In fact, showing similarly situated businesses being treated

25

differently not only serves a purpose, but it is a *required* element for plaintiff in opposing summary judgment.  Summary judgment is the "proverbial 'put up or shut up' moment" at which point a party needs to present evidence that would permit a rational trier of fact to find in its favor.  *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020).  Having provided no evidence demonstrating that there were similarly situated businesses treated differently, the court is left to conclude that no *reasonable* jury could find for plaintiff on its Fourteenth Amendment claim.

Even if plaintiff had provided evidence that similar businesses were treated differently, it also failed to meet its burden to demonstrate that defendants had no rational reason for doing so.  In order to prevail on an Equal Protection claim, a plaintiff must "negate any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Bd. of Trs. v. Garrett*, 531 U.S. 356, 367 (2001).  PHMDC operated on a complaint system under which, after receiving public complaints, it would send an employee to investigate whether there were indeed violations of the Order as reported.  Such a system helped conserve department resources and use them only where it was more likely to find a violation.  There is nothing unreasonable, much less irrational, about a municipal department with limited resources relying on reports of the public in determining which businesses to investigate for non-compliance.

As plaintiff itself notes, "[i]t would be seemingly impossible to ticket each and every parking, health ordinance, and zoning regulation violation."  (Pl.'s Opp'n (dkt. # 44) 16.)  Plaintiff makes this observation in an attempt to distinguish between random law enforcement, which it concedes is proper, with selective enforcement, which it maintains

26

is not.  However, building on plaintiff's metaphor to bring it closer to its situation, it would also be rational to ticket a car parked in a no-park zone after the city received numerous complaints about that specific car.  Indeed, what more rational way to send a message to the larger community that its order will be enforced than for a municipality to devote its limited resources to bring its most notorious scofflaw into compliance through education, citations and eventually threat of putting out of business.  *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 900 (7th Cir. 2012) (Easterbrook, J., concurring) (explaining that the fact that a municipality has "limited enforcement resources and could not fully investigate all complaints" serves as a rational basis for differential treatment, defeating a class-of-one claim).

Accordingly, the county's chosen enforcement procedure was also rational, and defendants are entitled to summary judgment in their favor on plaintiff's Equal Protection claim.

### C.  Takings Clause Claim

Finally, though least meritorious, plaintiff alleges that defendants' requirement that it post a sign violates the Takings Clause of the Fifth Amendment.  U.S. Const. Amend. V ("nor shall private property be taken for public use, without just compensation").  In support of its claim, plaintiff directs the court to *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), in which the Supreme Court considered a takings claim brought by the owner of an apartment building challenging a regulation requiring her to allow the installation of cable in the building.  Agreeing that forced installation of cable constituted a taking, the Supreme Court adopted a categorical rule:  "a permanent physical

occupation authorized by government," regardless of size, constitutes a taking, requiring compensation.  *Id.* at 423.

Unlike *Loretto*, however, there was no *permanent* taking here, as plaintiff essentially acknowledges in its opposition brief.   (Pl.'s Opp'n (dkt. #44) 23.)[11]   Still, plaintiff maintains that a *temporary* action can also be a taking, requiring compensation, pointing to *United States v. Westinghouse Electric & Manufacturing Company*, 339 U.S. 261, 267 (1950), which involved the government's condemnation of land and buildings for use during World War II.  *Id.* at 262.  However, while that taking was temporary -- only to be used during the war -- the taking denied Westinghouse Electric *complete* use of its property.  *Id.*  Thus, the Supreme Court clarified in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County, California*, 482 U.S. 304 (1987), that the only temporary takings requiring government compensation under the Fifth and Fourteenth Amendments is one that deprives an occupant of "all use of property."  *Id.* at 321.

In its opposition brief, plaintiff also hints that its takings claim may be based on the reduced capacity limits also included in the Order.  (Pl.'s Opp'n (dkt. #44) 24.) However, that argument is not only undeveloped, plaintiff did not even allege a takings claim based on reduced capacity.  Rather, plaintiff's complaint only concerns the mask

---

[11] The court need not consider whether the required posting of a sign constitutes a "taking" under the *Penn Central* factors, but that position seems dubious as well.  *See Penn Cen. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) (listing factors to consider including (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action").  Indeed, the court is aware of *no* case holding that merely requiring compensation for mandatory, prominent postings in a place of business constitutes a taking, whether for its employees or general public.  Rather, it is simply a cost of doing business, which even if a "taking," is more than amply compensated by all the public benefits that entails.

requirement in the Order.  (Compl. (dkt. #1-2) p.25 (describing Fifth Amendment claim as "The County/City Requirement to Post Signage Constitutes an Unconstitutional Taking Protected Under the 5th Amendment of the Constitution of the United States").)  If anything, plaintiff's complaint expressly disavows a capacity claim, among others noting instead that "[t]he Order requires businesses limit their capacity to 50%, develop and implement certain hygiene and cleaning policies, along with other requirements *not at issue here.*" (*Id.*, Statement of Facts ¶ 1 (emphasis added).)  As such, the court will not take up plaintiff's assertion of entirely new decreased capacity or utilization claim at summary judgment.

Because the court's rulings resolve all federal claims in this case, it declines to exercise supplemental jurisdiction over the remaining, largely unrelated state law claims. *See* 28 U.S.C. § 1367 (providing that a court may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction"); *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("The general rule, when the federal claims fall out before trial, is that the [district court] should relinquish jurisdiction over any supplemental (what used to be called 'pendent') state law claims in order to minimize federal judicial intrusion into matters of purely state law." (internal citation omitted)).  Instead, those claims will be dismissed without prejudice.

ORDER

IT IS ORDERED that:

1) Plaintiff Helbachs Cafe LLC's motion for partial summary judgment (dkt. #16) is DENIED.

2)  Defendants' motion for summary judgment (dkt. #30) is GRANTED.

3)  Defendants' motion to compel (dkt. #55) is DENIED AS MOOT.

4)  Defendants' motion for leave to file sur-response (dkt. #62) is GRANTED as to defendants' response to plaintiff's *Monell* arguments AND DENIED in all other respects.

5)  The clerk of court is directed to enter judgment in defendants' favor on all federal causes of action alleged in claims 2, 3 and 4.  The clerk of court is directed to remand the state law causes of action, namely claim 1 and part of claim 2, to the Dane County Circuit Court for further proceedings.

Entered this 16th day of November, 2021.

BY THE COURT:


/s/

_____
WILLIAM M. CONLEY
District Judge

30